**ARROW UNITED INDUSTRIES, INC.,**
**Plaintiff-Appellee,**

v.

**HUGH RICHARDS, INC.,**
**Defendant-Appellant,**

and

**A. J. Pegno Construction Corp.,**
**Defendant.**

**No. 1035, Docket 82–7101.**

United States Court of Appeals,
Second Circuit.

Argued April 8, 1982.
Decided May 6, 1982.

Martin E. Goldstein, New York City (McAulay, Fields, Fisher, Goldstein & Nissen, New York City, on the brief), for plaintiff-appellee.

Alfred L. Haffner, Jr., New York City (Lorimer P. Brooks, Brooks Haidt Haffner & Delahunty, New York City, on the brief), for defendant-appellant.

Before TIMBERS, KEARSE, and PIERCE, Circuit Judges.

KEARSE, Circuit Judge:

In this action brought principally under the Lanham Act, 15 U.S.C. § 1125(a) (1976), defendant Hugh Richards, Inc. ("Richards") appeals from the entry of a preliminary injunction against it in the United States District Court for the Southern District of New York, Henry F. Werker, *Judge*, prohibiting it (1) from designating certain products manufactured by plaintiff Arrow United Industries ("Arrow") as Richard's own products, and (2) from fulfilling two contracts with defendant A. J. Pegno Construction Corporation ("Pegno"). We affirm so much of the order as enjoins Rich-

ards from designating Arrow products as its own; but because Arrow failed to show that it would likely suffer irreparable harm if Richards were to perform the Pegno contract without passing off Arrow products as its own, we vacate so much of the injunction as prohibits Richards from performing the contracts.

## BACKGROUND

Arrow and Richards are competitors in the manufacture and installation of various types of air-control equipment, including dampers. Since about 1964 Arrow has manufactured and installed a damper known throughout the industry as the "Arrow-Foil." The district court found that no other entity in the United States makes or sells a damper like the Arrow-Foil. Richards apparently has been manufacturing and installing dampers of other types since 1963.

During the summer of 1981, the New York City Transit Authority ("Transit Authority"), invited bids on two contracts for the installation of ventilation equipment, including dampers, for the New York City subway system. The contract specifications required that all dampers be the product of a single manufacturer and be Arrow-Foil dampers or an approved equal. Pegno was a general contractor planning to bid on the Transit Authority contracts. In determining its bid for each of the general contracts, Pegno received bids with respect to dampers from both Richards and Arrow. In each instance Richards submitted the lower bid,[1] and when Pegno was awarded the

general contract it awarded Richards the subcontract.

Thereafter, Pegno and Richards were required by the contracts to submit to the Transit Authority acceptable sample dampers. To comply with this requirement Richards purchased three standard Arrow-Foil dampers from a jobber. It proceeded to remove the various stickers identifying these dampers as products of Arrow, it modified the dampers in size and perhaps in other respects, and it submitted the resulting dampers to Pegno and the Transit Authority with labels attached identifying them as Richards "Uni-Foil" dampers.[2]

Ultimately the Transit Authority found the samples "generally acceptable" in "concept." In the interim, however, Transit Authority personnel informed Arrow that the sample dampers submitted by Richards closely resembled Arrow-Foil dampers. Upon examination Arrow concluded that the samples were slightly modified Arrow-Foil dampers. Arrow then commenced the present action, claiming that Richards and Pegno had violated section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a),[3] by engaging in unfair competition, false representation, and false designation of origin. The complaint alleged that Richards and Pegno had submitted modified Arrow-Foil dampers to the Transit Authority as Richard's own, in order to show that they could meet the Transit Authority's contract specifications even though they lacked that capability. Arrow promptly moved, pursuant to Fed.R. Civ.P. 65, for a preliminary injunction pre-

1. The damper subcontract required the production and installation of other types of air-control equipment as well.

2. Richards's president testified that Richards adopted this course of action because it believed it did not have time to make for itself the component parts prior to the deadline for submission of samples.

3. Section 43(a) provides as follows:
    (a) Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending false-

ly to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

venting Richards from "displaying to potential customers a product of Plaintiff which bears an indicia [sic] of manufacture by Defendant Hugh Richards, or which is displayed in such manner as to create the impression that it is a product of Defendant Hugh Richards"; and from "filling any orders for the 'Uni-foil' for which samples were received by the New York City Transit Authority in about August 1981, or at any time thereafter."

On January 22, 1982, following an evidentiary hearing, the district court orally granted the motion. It ruled that Arrow was threatened with irreparable harm, because "[i]t is well settled that 'the consequences of trademark infringement, or passing off, and unfair competition generally, are by their nature not fully compensable by money damages,'" quoting *National Lampoon, Inc. v. American Broadcasting Companies*, 376 F.Supp. 733 (S.D.N.Y.), aff'd, 497 F.2d 1343 (2d Cir. 1974). The Court held that Arrow had established the existence of sufficiently serious questions on the merits to make them a fair ground for litigation, and concluded that the balance of hardships tipped decidedly in Arrow's favor because any harm to Richards brought about by the injunction could be compensated by money damages, while in the absence of an injunction Arrow might suffer "the irreparable harm of loss of good will which is not compensable in money damages." A written order was filed on

February 22, enjoining Richards, as requested, (1) from "directly or indirectly displaying to potential customers a product of Plaintiff which bears an indicia [sic] of manufacture by Defendant Hugh Richards, or which is displayed in such manner as to create the impression that it is a product of Defendant Hugh Richards"; and (2) from "filling any orders for the 'Uni-Foil' for which samples were received by the New York City Transit Authority in about August 1981, or at any time thereafter."

Richards appeals from this order,[4] contending principally that Arrow would not have been irreparably harmed had no preliminary injunction issued and that the balance of hardships does not tip decidedly toward Arrow.[5] We reject these contentions insofar as Richards has been enjoined from designating Arrow products as its own, but find merit in the contention that Arrow did not show a likelihood of irreparable injury absent an injunction against Richard's performance of the subcontracts.

## DISCUSSION

It is well-settled in this Circuit that a preliminary injunction may be granted only upon

"a showing of (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair

4. Pegno has not appealed. On January 27, 1982, Pegno sent Richards notice that the subcontracts were thereby terminated due to Richards's "failure to prosecute [its] work" on the subcontracts.

5. Richards also argues here, as it did below, that the district court lacked jurisdiction of the present action because both Arrow and Richards are New York corporations and all of the activities relating to the subcontracts took place in New York. The district court properly rejected this contention. The court accepted, at least preliminarily, Arrow's assertion that it has a substantial interstate business and found that "there is little doubt that the false designation of origin claims asserted against defendants, if ultimately proven, may adversely affect its interstate business." It is well established that Congress may, pursuant to its powers under the Commerce Clause, U.S.Const.Art. I,

§ 8, cl. 3, regulate any intrastate activity that affects interstate commerce. *Perez v. United States*, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971), *see Wickard v. Filburn*, 317 U.S. 111, 118–29, 63 S.Ct. 82, 85–91, 87 L.Ed. 122 (1942). Congress's expressed intent in passing the Lanham Act was, *inter alia*, "to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce," 15 U.S.C. § 1127, and § 1127 defines "commerce" as "all commerce which may lawfully be regulated by Congress." Section 43(a) prohibits the deceptive use of marks "in commerce." *See Steele v. Bulova Watch Co.*, 344 U.S. 280, 283–84, 73 S.Ct. 252, 254, 97 L.Ed. 252 (1952). The district court's finding as to effect on interstate commerce is not clearly erroneous and the court thus has jurisdiction of this action under the Lanham Act and 28 U.S.C. § 1331.

ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Sperry International Trade, Inc. v. Government of Israel*, 670 F.2d 8, 11 (2d Cir. 1982) (quoting *Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979) (per curiam)). If the moving party has established these elements, the granting of the injunction may be reversed only if the district court has abused its discretion. *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931–32, 95 S.Ct. 2561, 2567–68, 45 L.Ed.2d 648 (1975) ("[W]hile the standard to be applied by the district court in deciding whether a plaintiff is entitled to a preliminary injunction is stringent, the standard of appellate review is simply whether the issuance of the injunction, in the light of the applicable standard, constituted an abuse of discretion."); *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 206 (2d Cir. 1979).

Insofar as the district court enjoined Richards from the misbranding of Arrow products as those of Richards, we find that the applicable standard was met. As to the issue of irreparable injury, the district judge analogized the present case to cases involving trademark infringement and other forms of passing-off that produce a high probability of confusion as to the origin of the products, with the consequent likelihood that the plaintiff will lose sales and that the plaintiff's reputation will be injured. *E.g., Omega Importing Corp. v. Petri-Kine Camera Co.*, 451 F.2d 1190, 1195 (2d Cir. 1971) (Friendly, J.); *American Home Products Corp. v. Johnson Chemical Co.*, 589 F.2d 103, 106 (2d Cir. 1978). Judge Friendly, speaking for this Court in *Omega Importing*, stated the rationale of such cases as follows:

> Where there is, then, such high probability of confusion, injury irreparable in the sense that it may not be fully compensable in damages almost inevitably follows. While an injured plaintiff would be entitled to recover the profits on the infringing items, this is often difficult to determine; moreover, a defendant may have failed to earn profits because of the

poor quality of its product or its own inefficiency. Indeed, confusion may cause purchasers to refrain from buying either product and to turn to those of other competitors. Yet to prove the loss of sales due to infringement is also notoriously difficult, *Pure Foods, Inc. v. Minute Maid Corp.*, 214 F.2d 792, 797 (5 Cir.), cert. denied, 348 U.S. 888, 75 S.Ct. 208, 99 L.Ed. 697 (1954). Furthermore, if an infringer's product is of poor quality, or simply not worth the price, a more lasting but not readily measurable injury may be inflicted on the plaintiff's reputation in the market. See 3 Callmann, *supra,* § 88.3, at 188.

451 F.2d at 1195.

While we agree with the district court that the circumstances here adequately established that Richards's misbranding would likely cause injury to Arrow that would defy adequate calculation and monetary compensation, the typical passing-off case is not precisely parallel to the present case. For example, there is no parallel here to the normal circumstance that the reputation of the plaintiff may be tarnished through the provision in its name of products of inferior quality, for here the products are not purveyed in Arrow's name. Hence it is probable that any disdain for the quality of the products would injure the reputation of Richards, whose name appears on them, rather than that of Arrow, whose name has been removed. Further, it cannot be said that as a result of the misbranding Arrow would lose sales in the normal sense, since Arrow would have sold its goods to the person from whom Richards purchases them. It may be that Arrow would make a greater profit on sales directly to general contractors, such as Pegno, than it would on sales to jobbers serving as middlemen; but the record is silent as to whether or not this is so.

■ Rather, the record suggests injury to Arrow of another sort. The district court found that the Arrow-Foil damper, on the market since 1964, was well known throughout the industry, and that no other

United States company made a damper like it. Richards has argued that it has the know-how to make dampers of the Arrow-Foil type, and that to begin production it need only acquire certain tools and dies that are available to it. Assuming that this is so, what Richards would gain as a result of misbranding Arrow dampers as its own, is a foothold in the market for Arrow-Foil type dampers. To the extent, then, that Richards did eventually attain the capability to make an Arrow-Foil type damper of its own, its ability to compete with Arrow would have been unfairly enhanced both by the implicit representation that, for a longer time than would be true, Arrow was not the only manufacturer of the product, and by Richards's own spurious track record as a manufacturer of the product. Against this double-edged unfair competition, it seems highly likely that Arrow would lose some business to Richards, and that it would be virtually impossible to measure the scope of that loss. Since Arrow's damages will not adequately be ascertainable, the district court did not err in determining that the likely harm to Arrow is sufficiently irreparable to justify a preliminary injunction. *Ives Laboratories, Inc. v. Darby Drug Co.*, 601 F.2d 631, 644 (2d Cir. 1979); *Interphoto Corp. v. Minolta Corp.*, 417 F.2d 621, 622 (2d Cir. 1969) (per curiam).

We have no difficulty in concluding that the other elements of the standard for preliminary injunctive relief also have been met. Section 43(a) of the Lanham Act prohibits "affixing" "a false designation of origin" on products in commerce. Arrow's contention that Richards did little more than reduce the size of the standard Arrow-Foil damper and affix upon the result Richards's own identifying marks presents sufficiently serious questions going to the merits of Arrow's Lanham Act claim to make them a fair ground for litigation.[6] *See Matsushi-*

ta *Electric Corp. v. Solar Sound Systems, Inc.*, 381 F.Supp. 64 (S.D.N.Y.1974).

Finally, there is no question that the balance of hardships tips decidedly in Arrow's favor with respect to the misbranding provisions of the preliminary injunction. Arrow has adequately established the likelihood of irreparable harm as a result of Richards's misbranding of Arrow products as Richards's own. Richards, on the other hand, does not claim that the injunction against misbranding Arrow products will injure it at all; indeed Richards asserts that it has no intention of using Arrow dampers in the future. (Richards's Brief at 35–36.) *See also* note 2 *supra.*

We thus affirm so much of the injunction as prohibits Richards from branding or otherwise representing Arrow dampers as those of Richards.

The second branch of the preliminary injunction, however, *i.e.*, the injunction against performance of the Pegno subcontracts, does not meet the applicable legal standard for the issuance of a preliminary injunction. This provision enjoins Richards from "filling any orders for the 'Uni-Foil' for which samples were received by the New York City Transit Authority in about August 1981, or any time thereafter." The district judge does not appear to have considered the propriety of such an injunction apart from the propriety of a prohibition against misbranding. When we focus specifically on the performance injunction, we are unable to discern any basis for concluding that in its absence Arrow will suffer injury that is irreparable. Arrow contended in the district court that Richards is incapable of supplying the required dampers without using Arrow products. If this is true, Arrow should be adequately protected from any injury simply by virtue of the misbranding injunction. If Arrow is

---

**6.** Richards argues that it incurred no liability to Arrow because it merely copied Arrow's dampers, and such copying is not prohibited where the product has not acquired secondary meaning. In *Vibrant Sales, Inc. v. New Body Boutique, Inc.*, 652 F.2d 299 (2d Cir. 1981), we did indeed indicate that, in order to recover, a Lan-

ham Act plaintiff complaining of copying must prove that the copier features of its product had acquired secondary meaning. But the claim against Richards in the present case is not that it copied, but that it actually used Arrow products and misrepresented their origin.

wrong, and Richards is able to produce Arrow-Foil type dampers of its own, Richards will, absent the performance injunction, be capable of supplying dampers under the subcontracts without misrepresenting their origin. In this event, the unfairness to Arrow of any loss of future business would seem to be quite speculative: to the extent that Richards is able to manufacture its own dampers to perform the subcontracts, its track record in the industry will be real rather than spurious, and Arrow cannot complain of legitimate future competition. It is of course obvious that if Richards can manufacture its own dampers, Arrow *may* lose its sales to Pegno on the two subcontracts presently at issue.[7] But it is difficult to view such a loss, assuming that it is one for which Richards is ultimately found liable,[8] as a loss that cannot be calculated with reasonable mathematical precision and adequately compensated by an award of money damages. Where a loss can be so calculated and compensated, it is not "irreparable" and hence will not justify the granting of injunctive relief. *See Sperry International Trade, Inc. v. Government of Israel, supra,* 670 F.2d at 12.

### CONCLUSION

We affirm so much of the preliminary injunction as prohibits Richards from labeling or otherwise displaying dampers made by Arrow as products of Richards, and we reverse so much as prohibits Richards from fulfilling the subcontracts with Pegno. The mandate shall issue forthwith. Each party shall bear its own costs.

---

7. We have been informed that Pegno, after terminating the subcontracts with Richards, *see* note 4 *supra*, awarded the subcontracts to Arrow. It is unknown whether, if the performance injunction is vacated, Pegno will be able or inclined to cancel the subcontracts with Arrow and reaward them to Richards.

8. Arrow appears to have assumed that Richards was awarded the subcontracts on the basis of the spurious samples. There was testimony, however, that the award preceded the provision of samples. If the latter is true the proposition that Richards's misbranding caused Arrow's loss of the subcontracts is weakened, although not necessarily negatived. We express no view as to the merits of Arrow's claims.