STANDARD & POOR'S CORPORATION,
Plaintiff,

v.

COMMODITY EXCHANGE,
INC., Defendant.

No. 82 Civ. 2545(MP).

United States District Court,
S. D. New York.

May 13, 1982.

**1064**

Darby & Darby, P. C., New York City, for plaintiff; William F. Dudine, Jr., Maxim H. Waldbaum, Ethan Horwitz, Adda C. Gogoris, New York City, of counsel.

Baer, Marks & Upham, New York City, for defendant; Eugene R. Scheiman, Barry J. Mandel, Allan Dinkoff, New York City, of counsel.

## DECISION

MILTON POLLACK, District Judge.

### General Findings of Fact

The plaintiff seeks a preliminary injunction pursuant to Rule 65 Federal Rules of Civil Procedure against defendant's use (or misuse) of plaintiff's carefully calculated 500 equity stock index in respect of futures contracts based thereon and traded on defendant's commodity exchange and against defendant's misuse of plaintiff's trade name, trademarks and reputation.

The jurisdiction of the Court over the subject matter is based on 15 U.S.C. Section 1051 et seq., 28 U.S.C. Sections 1331 and 1338. This district is the proper venue for this action, 28 U.S.C. Sections 1391 and 1400, and the Court has personal jurisdiction over the defendant.

The defendant ("Comex") had unsuccessfully over a long period of time commencing in 1979 sought to obtain a license from the plaintiff (S&P) to use the latter's S&P 500 Stock Index for futures contracts to be traded on defendant's commodity exchange. Its efforts having failed to yield it either an exclusive or non-exclusive license, Comex decided ultimately to attempt to market a "Comex 500 Stock Index" for futures contracts and to link it with plaintiff's name and with the S&P 500 Stock Index without S&P's permission or consent and over S&P's objection.

On or about December 19, 1980, Comex applied to the Commodities Futures Trading Commission (CFTC) for a designation as a contract market for futures contracts based upon a so-called "Comex 500 Stock Index". In its application, Comex referred interchangeably to the S&P's 500 and the Comex 500 Stock Price Index. Comex further emphasized that the Comex Index would use the same 500 stocks and the same method of computation as the Standard & Poor's 500 Stock Index.

On learning of this application, S&P promptly filed a lengthy opposition thereto with the CFTC objecting to all reference by Comex to S&P and to its calculated S&P 500 Stock Index. S&P told the Commission that its position was that:

"Comex is free to exercise its own initiative in the creation of an index without free-riding on S&P's research, efforts, expense, quality, integrity, name, reputation and trademarks."

During the pendency of the CFTC application Comex finding itself unable or unwilling to calculate a reliable and acceptable Stock Index, among other reasons, decided to abandon the creation and use of its own 500 stock index. Consequently, it filed an amendment to its application before the CFTC, and issued a brochure in equivocal language but nonetheless linking S&P with Comex stating confusingly that Comex futures contracts were to be quoted in terms of the Comex 500 Stock Index and a settlement thereof to be based upon the Comex 500 Stock Index "at a price equal to that day's closing quotation of the Standard & Poor's 500 Stock Price Index."

Thereupon, S&P promptly instituted this suit to restrain Comex from trading a futures contract based on the use of S&P's name or the S&P 500 Stock Index. The complaint charged trade name and trademark infringement, likelihood of confusion, misappropriation of property rights, copyright and Lanham Act violations, and sought injunctive relief and damages.

Knowing that it would be sued, Comex nonetheless on April 27, 1982 published and disseminated in advance of having been designated as a market to trade in futures on a stock index, a large quantity of brochures linking Comex futures contracts with an alleged Comex 500 Stock Index which was nonexistent and adding confusingly that settlement of such contracts was to be based on the S&P 500 Stock Index. The brochures featured S&P's name prominently and repetitively implying to the reasonable reader that there was some tie, some sort of affiliation between Comex and S&P in respect to the subject matter.

On the following day, April 28, 1982, before any meeting by the CFTC to consider and pass on the Comex application for a designation as a market, the financial press carried full scale advertisements placed by Comex announcing the futures market for trading in the Comex 500 Stock Index. Sometime that morning, the CFTC did take up the Comex application on its calendar and did issue a designation to Comex as a futures market to trade contracts on a Comex 500 Stock Index; it did not authorize trading by Comex of a futures contract based on S&P's 500 Stock Index, the contract described in the Comex brochures and public relations materials.

S&P applied to this Court for a Temporary Restraining Order against Comex pending a hearing of an application for a preliminary injunction. The TRO was granted and an early trial date was set. The Court found probability of irreparable damage to S&P and likelihood of success or at least substantial questions going to the merits with the balance of the equities favoring S&P. Comex attempted by immediate appeal to obtain an order from the Second Circuit setting aside the TRO; that was denied by the appellate court. The hearings on the preliminary injunction commenced within a week and good cause being shown, the TRO was extended for another ten-day period.

On the basis of the evidence adduced, including the demeanor evidence and resolving the issues of credibility presented, the Court finds and decides that:

Plaintiff has established by a preponderance of the evidence worthy of belief and the reasonable inferences therefrom that the defendant intended improperly (i) to link S&P with Comex as a commercial prop for futures contracts based on a 500 stock index; (ii) to misappropriate the property of the plaintiff and to trade directly on plaintiff's name and the S&P 500 Stock Index; that this was without authority from S&P and over its objection; that defendant's acts have caused and will, unless restrained, continue to cause irreparable injury to plaintiff in the sense that it may not be fully or fairly compensable in damages; that defendant's acts involve a high probability of confusion of what Comex is offering or has proposed to offer to the public and traders in futures as well as a high probability of confusion of the relationship

(or lack of it) between the parties and of the source of the 500 stock index tied to the futures contract offered by Comex; and that defendant's acts will result in dilution of plaintiff's name and reputation and involve infringement on plaintiff's trade name and trademarks.

The evidence establishes that defendant has used and intends to use the S&P 500 Stock Index and the S&P name and reputation in a manner to produce a high probability of confusion as to the source of the 500 stock index and S&P's affiliation therewith and with Comex among persons using ordinary care and prudence in entering into futures contracts based on a 500 stock index. Ordinary traders exercising ordinary care would be likely to enter into a Comex futures contract in the belief that it was linked with and backed by S&P and the highly probable consequences of the repetitive references to S&P in the selling materials issued by Comex and the use of S&P's 500 Stock Index and the S&P name, complained of, in all reasonable probability would be to confuse the public and traders as to the source, sponsorship, approval or affiliation of the S&P 500 Stock Index and S&P with Comex.

It has been admitted by defendant's expert that there is no impediment or reason why Comex could not immediately trade in futures contracts based on a stock index without the use of the name of S&P or reference to S&P's 500 Stock Index. The fact that the index could be focused solely on the figure thereof appearing on the settlement date of the contract by careful or discriminating traders is not enough to lead the Court to conclude that there is no likelihood of confusion of linkage or affiliation.

### The Findings in More Detail

Plaintiff, Standard & Poor's Corporation, Inc., ("S&P") is a corporation organized under the laws of the State of New York, and is a wholly owned subsidiary of McGraw Hill, Inc. S&P is engaged *inter alia* in the business of preparing, selling and providing informational services to and for the financial community. S&P and its predecessor

companies have been engaged in this business since 1860. During the period from 1860 to present, S&P has developed a reputation in the financial community for reliability and veracity.

Defendant Commodity Exchange, Inc. ("Comex") is a not-for-profit membership corporation organized under the laws of the State of New York. Comex was organized under the laws of the State of New York. Comex was organized in 1933 to provide, and does now provide a centralized market-place for the trading of various Commodity Futures Trading Commission ("CFTC") granted Comex's application for designation as a contract market for the Comex 500 Stock Index future contract ("Comex 500").

The CFTC stated that the grant "should not be viewed as a legal determination by the Commission with respect to the validity of any copyrighted or related claims."

Plaintiff has registered "The Standard '500'," "Standard & Poor's Daily Stock Prices Indexes," and "Standard & Poor's Hourly Stock Price Indexes" in the United States Patent and Trademark Office as trademarks. S&P was not required to disclaim "500" in its registration number 756,-133 of THE STANDARD "500". Although plaintiff has not registered the terms "500" and "500 Index" by themselves, these terms as used herein by S&P and Comex have acquired trademark significance indicative of S&P in the market-place and among the investing public (*i.e.,* secondary meaning). Comex's own brochure notes that "The Standard & Poor's 500" is an S&P trademark. Likewise, Comex internal correspondence uses "S&P 500" and "500 Stock Index" to refer to the S&P 500 Stock Index. The S&P 500 is the only stock index which uses 500 stocks and which includes the numeral "500" in its name. People familiar with stock indexes would know that "the 500" refers to the S&P 500.

Plaintiff has protected its publications which disseminate the S&P 500 Index data by applying copyright notices thereto, and by registering such publications with the United States Copyright Office.

In 1923, S&P pioneered the issuance of a scientifically constructed stock price index. In 1957 the index was revised to be based on the prices of 500 common stocks and a base period of 1941–43 was adopted. Since that time the index has been known to the industry as the 500 index. The S&P 500 Stock Price Index is a broad-based, weighted, composite index based on the prices of 500 selected stocks. The index is designed to accurately portray a pattern of common stock price movement. Due to its broad base, the 500 Index is less susceptible to manipulation than an index based on a small number of stocks, and it also provides a more accurate barometer of market performance. Of the broad-based stock indexes, the S&P 500 is the best known, the most widely used, and the most accurate indicator of market conditions. The 500 is the most popular stock price index used by institutional investors and investment advisors.

The index was developed and is maintained by S&P at considerable expense and effort. The stocks that comprise the S&P 500 Index are changed by S&P from time to time when, based on S&P's research and expertise, a change is required to take account of changes in a constituent company or the relevant industry. Such changes do not alter the index number itself, but are designed to insure the continuity and accuracy of the S&P 500 Index.

The S&P 500 index is now being calculated for S&P by General Telephone and Electronic ("GTE") on a minute to minute basis. The calculations are made by GTE as the prices of each stock in the index change throughout the day. In addition, S&P calculates the index on a daily basis as an accuracy check on GTE. Furthermore, S&P is working with another company, Bridge Data, to calculate the Index on a minute to minute basis as a further check on accuracy of the 500 index values. S&P has hired Arthur Young & Co. as consultants to insure that calculation of the 500 index is proper.

While the formula used by GTE and Bridge Data in calculating the S&P 500 Index is known to the public, the actual minute to minute and day-to-day calculations depend upon certain inputs determined solely and exclusively by S&P based on special calculations and determinations known only to S&P. Only S&P knows the exact values of these inputs and the timing of their introduction into the S&P 500 Index. They are based upon S&P's research and are arrived at by S&P's application of its expertise and skill. Hence, the exact numerical values of the Index cannot be calculated by Comex or any other third party without S&P's direct participation.

S&P publishes and disseminates the list of constituent stocks in the index. Update announcements are made on the day a stock is introduced or deleted from the index. In addition, the number of shares of each constituent stock is calculated by S&P. S&P decides according to its own expertise which additions or deletions of shares outstanding are taken into consideration in calculating the index. These decisions are only made known to the public well after the decision is made. Without timely knowledge of both these type decisions, no one could accurately calculate the 500 Index.

S&P disseminates its S&P 500 Index data in various ways including selling the information for stock comparison purposes in copyrighted publications. S&P's publications using the 500 Index are advertised and promoted by S&P by the use of direct mail advertising, advertising in newspapers and television, a sales force of 16 persons, a telephone sales force of four or five people and a national accountants sales force of five people. In 1981 S&P spent over $3,179,000.00 on such advertising and promotion and in 1980 it spent over $2,827,000.00 and in 1979 it spent over $2,460,000.00. Its revenues for its lead publication, OUTLOOK, were $5,179,000.00 in 1981. The 500 Index is generally used by the public and by institutions as a barometer; that is, the 500 Index is a measure of how well a stock or a portfolio of stocks is performing in comparison to the market.

S&P also licenses use of the 500 Index to data disseminating organizations for royal-

ties. Likewise it has also licensed the Chicago Mercantile Exchange ("CME") to use the 500 Index for index futures trading. S&P exercises further control over the dissemination of its 500 Index information through a permission review system, i.e., requests by third parties for use of the index are screened by S&P to determine whether such use is permissible and if permissible, whether or not for a royalty. The criteria for deciding whether or not to allow such use is how the use will affect S&P's reputation (id.).

In addition, S&P allows dissemination of its 500 Index data through press, wire, and quote services which S&P determines to be consistent with S&P's interests in the index. S&P may discontinue (and has discontinued) these special services if and when the use of the S&P information in the services reflects adversely on S&P. To the degree that such uses are supportive of S&P's reputation, they are beneficial to S&P and form a part of S&P's advertising and promotion of its image. S&P receives benefits in such publications in that its name and reputation and the level of confidence that people have in subscribing to S&P's services and publications are tied to its 500 Index. S&P is recognized by its 500 Index.

S&P has also controlled the uses to which others put its 500 Index.

A futures contract based on the S&P 500 Index is an agreement between the "long" (buyer) on the "short" (seller) positions. The "long" has the right and the obligation to receive on the settlement date a contract value of 500 times the then current S&P 500 Index value. The "short" has the right and the obligation to deliver on the settlement date a contract value of 500 times the S&P 500 Index value. Instead of requiring delivery and receipt of the stocks then in the S&P index (which would be impractical if not impossible), delivery and receipt of the cash equivalent is required for settlement.

In 1978, S&P was approached by the Chicago Mercantile Exchange (hereinafter "CME") to obtain rights to use the S&P 500 Index in connection with a securities index

futures market. CME is the second largest commodity exchange in the country and is highly regarded in the market. In 1979, CME and S&P entered into an agreement whereby (among other things) CME was granted a pilot program of an 18-month period of exclusivity to develop a futures contract market using the S&P 500. In return, S&P was to receive $300,000. After the 18-month pilot program, S&P is to receive $100,000 per year plus a royalty of ten cents per contract. It is estimated that this license will produce an annual income of $300,000 to $500,000 or more to S&P. S&P has the right to terminate the license to CME and will do so if publicity is unfavorable.

On February 28, 1980 S&P entered into a license agreement with the CME.

The license agreement permits CME to use S&P's name and 500 Index for the CME futures contracts and provides for S&P assistance to CME in marketing the contract under rigid controls and for substantial royalties and provides for S&P assistance to CME in marketing the contract: The license provides for an initial pilot project period and further provides that either party can cancel the agreement if "there has been any material damage or harm suffered by it by reason of performance thereunder."

In May 1979, Comex developed a proposal to use S&P's 500 Index as the basis of a futures contract as it believed it would be the best index to use for such a contract. In order to proceed, Comex decided it had to begin speaking with S&P for a license to use the 500 Index. In developing the contract, Comex's management consultants recommended that Comex's primary objectives be:

"—First, to establish the S&P contract as the premier equities index futures contract and

"—Second, assuming non-exclusivity, to establish Comex as the dominant market for the contract...."

Comex management agreed with this opinion of its consultants to first establish S&P's index.

Comex had discussions with S&P about a possible licensing agreement in the summer of 1979. In June and July, 1979, representatives of Comex and S&P conferred, and Comex sought to persuade S&P to license Comex in preference to CME and to that end made presentations to S&P. Comex was interested in a license not only to be able to use S&P's name for the contract and to have S&P's assistance in marketing the contract but specifically to be able to use the 500 Index.

Unable to purchase rights to the S&P 500, Comex obtained an opinion from counsel that they could proceed with their plans to trade futures contracts based on a Comex 500 stock index "so long as Comex makes it clear that it is selling a futures contract based on a Comex 'copy' of the S&P Index, *not* a futures contract based directly on the S&P Index and *not* a futures contract sponsored, sanctioned or approved by S&P". The Comex 500 is not a copy of the S&P 500, it is the S&P 500. The inference to be drawn is that Comex is S&P and the source is S&P and that Comex is just another S&P.

On December 23, 1980, Comex applied to the CFTC for designation as a contract market for futures contracts based on a Comex 500 stock index. The Comex 500 used the same stocks and the same method of computation as the 500, but in explaining how the index was to be derived, referred to it as an index that "essentially duplicates" the S&P 500. The implication was that Comex intended to independently derive a stock index using the S&P 500 stocks and the S&P 500 mathematical formula, at least to the extent that formula could be ascertained. Comex provided the CFTC with a copy of the opinion it had received from its counsel that such action was proper.

S&P submitted its objections to such a contract to the CFTC. S&P also had various meetings with Comex making it clear that if Comex proceeded with a futures contract based upon S&P's 500 Index, S&P would take legal action to attempt to prevent such use. S&P stated to Comex that S&P did not wish Comex to use the S&P name, the 500 name, the 500 stocks which comprise the index or to use the index in their futures contract. Comex understood that if it ignored S&P's position S&P would take legal action.

As late as March 22, 1982, Comex was still characterizing its index as "substantially similar" to the S&P 500, which it called "the most attractive vehicle for stock futures trading".

On April 19 and 21, 1982, Comex filed amendments to its application to the CFTC stating that the "Comex 500 futures contract is directly based upon the Standard & Poor's 500 Stock Index". This meant that there is actually no Comex 500 Index. In fact, there never was a Comex 500 Index as Comex had never made arrangements to actually calculate it. Comex admits that Comex never intended to get into the stock index business.

The Comex futures contract uses the S&P 500 Index on a minute-to-minute basis. The Comex futures contract settles at the S&P 500 Index on the settlement date which is once a month. However, the cost or value of the Comex futures contract at any given time is related to the value of the S&P 500 Index at that time. The difference between the two figures is a function of interest costs. To this end, Comex required and contracted for a timely minute-to-minute quote of the S&P 500 Index.

Comex went forward with its proposed futures contract based on the 500 Index. In its CFTC application Comex intentionally or with reckless indifference confused the S&P 500 Index with its then-labeled Comex 500 Index, which it represented as "essentially duplicating" the S&P Index. Comex also misrepresented to the market and public that its Comex index was not the S&P 500 Index, nor a copy of it, but instead was "substantially similar" to the S&P Index; in fact there was no Comex Index.

These measures of describing the so-called Comex index as "essentially duplicating" and "substantially similar" to the S&P Index were taken by Comex not to base the contracts directly on the S&P Index. How-

ever, two days prior to commencement of this action, Comex amended its CFTC application to directly appropriate the S&P Index. Comex filed a second supplemental amendment to this same end on the day this suit was commenced.

In early March, 1982 Comex distributed a brochure which referred only to "a value weighted portfolio of 500 industrial, utility, transportation and financial stocks...." Just prior to this suit the revised version added that the Comex index included the stocks "... that make up the Standard & Poor's 500", and made direct references to S&P's "Standard & Poor's" and "Standard & Poor's 500" trademarks.

Comex advertisements and brochure which were run and distributed after this action was started made even more direct appropriation of S&P's name, marks, and data. Nowhere in Comex's advertisement or promotional material did it ever state that it had no relationship with S&P.

Comex's advertisements and brochures give the impression that S&P has endorsed or is somehow associated with the trading of the Comex 500 Index futures contract or affiliated with Comex.

For example, the Comex advertisement for its futures contract which was published in several major newspapers starts as follows:

"It's a trader's dream. America's most widely followed index from New York's most active futures exchange"

Moreover, these Comex advertisements refer to S&P four times and Comex has distributed promotional literature which illustrate charts of the S&P 500, labeled as such. In its advertising and promotional materials, Comex has never suggested that it is offering futures based on the S&P 500 without the authorization of S&P.

Another example of Comex's continued references to S&P's name and mark is a Comex brochure which speaks of an "historic marriage" stating that the focal point of the Comex 500 logo is the "X" which interlocks Comex with a large block of 500 stocks.

The language of the Comex advertisements is calculated to cause, and will cause, the reader to believe that there is a relationship between S&P and Comex, and that S&P at least endorses the trading of futures contracts based on the Comex 500. In promoting its index, Comex deliberately sought to capitalize on the extraordinary reputation and goodwill of S&P in the financial community. As stated by Mr. Martell, vice-president of Comex "I can't see how it would hurt". Due to the use of "Comex 500", to the nature of the advertising which links Comex to S&P and the use of S&P's well-known index, consumers would be confused into believing that S&P in some way sponsored or approved Comex's index futures contract. S&P is referenced substantially as much as Comex and with equal prominence in Comex's brochures and advertisements.

Comex intends to market futures contracts based on the S&P 500 unless it is restrained by this court. Such action by Comex might result in the purchase and sale of contracts possibly worth tens of millions of dollars for each day of trading. These contracts would be closed out or settled over the next 24 months. Thus, an adjudication upholding S&P's rights after trading had commenced would directly affect those traders who bought Comex 500 futures prior to such an adjudication. At the very least, if Comex is enjoined after trading starts, such traders would be effectively locked into existing futures contracts with potentially disastrous consequences.

Furthermore, Comex has no way, even if not enjoined by this court, to guarantee to its customers (and to the CFTC) that it will be able to provide a viable market for S&P 500 futures. Comex is under an obligation to notify the CFTC of any changes in the "composition or computation" of the 500 Index. S&P is under no obligation to inform Comex of these changes. Indeed S&P is under no obligation to Comex to calculate the 500 Index. Furthermore, for an effective market effort, there must be coordination between the exchange and the index source, which coordination is not present

vis-a-vis S&P and Comex. Thus, Comex is in no position to guarantee performance of its so-called Comex 500 contracts.

S&P would be harmed or is subjected to risk of harm from the forced association with Comex and the injury it sustains will be irreparable in the sense that they may not be fully compensable in damages. It is clear that Comex has associated itself with the S&P Index because of S&P's unquestioned reputation and reliability. If problems should arise in marketing the Comex 500 contracts, it is likely that S&P will be drawn into the circle of liability and those problems will involve S&P either directly or indirectly.

Use of the S&P name by Comex in a way which suggests a relationship between the two will have a high probability to tarnish, and thus diminish, the goodwill of S&P's name.

S&P would also be irreparably harmed by the loss of revenues which it would otherwise earn under the CME agreement. The injury is irreparable because the loss would be incalculable, since there would be no way to measure the actual volume of lost sales. An equal if not more serious harm would be S&P's loss of control over its marks, name, and index. These are among S&P's most valuable corporate assets. Once lost, or even if only tarnished, they cannot be restored to their full value.

The hardships on the public and on S&P are set forth above. There are no countervailing hardships worthy of belief weighing in favor of Comex. The claim of hardship by Comex of a somewhat delayed entry into the index futures market is overdrawn.

The Court concludes that:

S&P has met its burden of proof requisite for the issuance of a preliminary injunction herein having established (1) irreparable damage and (2) likelihood of success on the merits or if there be any doubt of success, then sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the plaintiff which is requesting the preliminary relief.

"The Standard '500'", "Standard & Poor's 500 Stock Index", "S&P 500", "The 500 Index" are either registered or common law trademarks of plaintiff for its stock index and identify S&P and S&P's product.

The numerical values of the S&P 500 cannot be calculated by Comex or any other party without S&P's direct participation. As a statistical certainty—anyone attempting to duplicate the S&P 500 Index would eventually deviate from it—proving its unique property characteristic as well as the incentive to appropriate it. S&P has become known as the most active of the indicators of stock market performance, due to its skills and reliability.

Comex is misappropriating the S&P 500 Index and the skills, expenditures, labor and reputation of S&P in generating and producing the S&P 500 Index, for Comex's own advantage and profit by creating a futures contract based on the S&P 500 Index.

The use of S&P's trade name and trademark will cause confusion in the minds of the public about the sponsorship or origin of the Comex 500 stock index and about what Comex is offering to the public and traders in contracts for futures based on a stock index.

Defendant's acts will result in dilution of plaintiff's name and reputation and subject plaintiff to risk of liability to third persons who may question the legality of defendant's acts and statements concerning the Comex contract as well as involving infringement on plaintiff's trade name and trademark.

The terms of the injunctive relief contained in the TRO herein should be and hereby are extended preliminarily and for the duration of this suit through the trial thereof on the merits.

The motion of the defendant to dismiss the complaint for failure to state a claim on which relief may be granted is in all respects denied.

The foregoing shall constitute the findings and conclusions required by Rule 52(a) Federal Rules of Civil Procedure.

So Ordered.