**STANDARD & POOR'S CORPORATION, INC., Plaintiff-Appellee,**

v.

**COMMODITY EXCHANGE, INC., Defendant-Appellant.**

**No. 1373, Docket 82–7377.**

United States Court of Appeals, Second Circuit.

Argued June 16, 1982.

Decided June 29, 1982.

---

William F. Dudine, Jr., New York City (Darby & Darby, Maxim Waldbaum, Ethan Horwitz, and Adda G. Gorgoris, New York City, of counsel), for plaintiff-appellee.

Eugene R. Scheiman, New York City (Baer, Marks & Upham, Mark A. Buckstein, Barry J. Mandel, Allan Dinkoff, William A. Brandt, Jr., Joshua B. Parker, Gottlieb, Rackman & Reisman, James Reisman, New York City, of counsel), for defendant-appellant.

Before NEWMAN and PIERCE, Circuit Judges, and KNAPP, District Judge.[*]

PIERCE, Circuit Judge:

One of the more recent developments in the field of futures trading has been the commencement of trading of stock index futures contracts on the nation's commodity exchanges. This case, currently in its preliminary stages, raises questions of whether and, if permitted, to what extent a futures exchange may offer for trade a stock index futures contract which relies for settlement purposes upon a popular and widely available stock index over the objection of the commercial enterprise which prepares the index. Following a five day evidentiary hearing in the United States District Court for the Southern District of New York, 538 F.Supp. 1063, Judge Milton Pollack granted the motion of plaintiff-appellee Standard & Poor's Corporation, Inc. ("S&P") for a preliminary injunction, enjoining defendant Commodity Exchange, Inc. ("Comex") from trading any futures contract which is based upon the Standard & Poor's 500 Stock Index and which makes use of S&P's name, marks and reputation. Because the trial judge did not abuse his discretion in issuing the preliminary injunction, we affirm.

* Honorable Whitman Knapp, United States District Judge for the Southern District of New York, sitting by designation.

1. In addition, pursuant to licensing agreements, the Kansas City Board of Trade presently offers a futures contract based upon the Value Line Index and the New York Futures Exchange

## FACTS

In 1979, Comex, a not-for-profit membership corporation organized under the laws of New York State, which provides a centralized marketplace for the trading of various commodity futures, sought from S&P a license to use the Standard & Poor's 500 Index as an integral part of a stock index futures contract to be traded under Comex' auspices. The Standard & Poor's 500 Index is a broad-based, weighted compilation of 500 common stocks which is calculated by S&P and is designed to measure the overall performance of the stock market. S&P did not reach an agreement with Comex, but did contract with the Chicago Mercantile Exchange ("CME"). Pursuant to its arrangement with S&P, the CME is presently trading a stock index futures contract which utilizes the Standard & Poor's 500 Index—the contract is known as the S&P 500 Futures Contract.[1]

On December 19, 1980, Comex applied to the Commodity Futures Trading Commission ("CFTC") for designation as a contract market for futures based upon the Comex 500 Stock Index. The application stated that the Comex 500 Index would "essentially duplicate[ ]" the Standard & Poor's 500 Index, using the same 500 stocks as the Standard & Poor's 500 Index and the identical method of compilation. As late as March 1982, while Comex' application to the CFTC remained pending, Comex still characterized the Comex 500 Index as "substantially similar" to the Standard & Poor's 500 Index. By letters to the CFTC dated April 19 and April 21, 1982, Comex filed amendments to its 1980 application which, although still referring to a Comex 500 Index, indicated that the settlement price of the Comex 500 contract would be the then current Standard & Poor's 500 Index value. These submissions made clear that a separately calculated Comex 500 Stock Index never existed, nor does one presently exist.

offers a futures contract based on the New York Stock Exchange Index. Moreover, the Chicago Board of Trade, over the objection of Dow Jones, Inc., plans to offer a futures contract based on the Dow Jones Averages. See *Chicago Board of Trade v. Dow Jones, Inc.*, No. 82 L 4067 (Cir.Ct. Cook County June 4, 1982).

On April 21, 1982, S&P filed a complaint in the district court against Comex, alleging trademark infringement and false designation of origin in violation of the Lanham Act, 15 U.S.C. §§ 1114, 1125(a), common law trademark infringement, trademark dilution in violation of N.Y.Gen.Bus.Law § 368–d, common law unfair competition and misappropriation, interference with business relations, and copyright infringement. The complaint sought equitable relief as well as actual and punitive damages arising from the proposed trading of the Comex 500 Stock Index futures contracts.

One week later, the CFTC designated Comex as a futures market for the trading of Comex 500 Stock Index futures. Like other such contracts, every aspect of the Comex 500 Stock Index futures contract is standardized except for the price. According to Comex' application to the CFTC, the standard contract unit is $500 times the Comex 500 Stock Index, an index which is admittedly identical to the Standard & Poor's 500 Index. The settlement price of the contract is based upon the closing value of the Standard & Poor's 500 Index on the last day of trading. Thus, a "long" or buyer has the right and obligation to receive on the settlement date a contract valued in dollars at 500 times the then current Standard & Poor's 500 Index value; a "short" or seller has a converse right and obligation. In permitting Comex to conduct trading of the Comex 500 Stock Index futures contract, the CFTC properly noted that the designation "should not be viewed as a legal determination by the Commission with respect to the validity of any copyright or related claim raised with respect to this contract."

On the same day that Comex received the CFTC designation, April 28, the district judge granted S&P's application for a temporary restraining order and directed Comex to show cause why a preliminary injunction should not issue. The restraining order stated in pertinent part:

> Defendant ... [is] hereby temporarily restrained from further acts of misappropriation, false designation of origin, unfair competition, trademark infringement and copyright infringement arising from defendant's preparing to trade, trading in and advertising futures contracts based upon the S&P 500 Index compilation or some other confusingly similar index and which use the S&P name, marks, and reputation.

By Order dated May 3, 1982, this Court declined to stay the temporary restraining order.

Between May 4 and May 12, the district judge conducted a five-day evidentiary hearing at which nine witnesses testified and the deposition testimony of three other witnesses was received. Acting with characteristic expedition, on the following day, May 13, Judge Pollack read an opinion from the bench which granted S&P's motion for a preliminary injunction. In essence, the trial court ruled that Comex intended "to link S&P with Comex as a commercial prop for futures contracts based on a 500 stock index;" that Comex intended to misappropriate plaintiff's property and to trade directly on plaintiff's name and the Standard & Poor's 500 Index; that there was a high probability of confusion regarding the relationship between the parties, the source of the Comex 500 Stock Index, and the source of the stock index futures contract traded on the Comex; and that the trading of Comex' futures contracts would cause irreparable injury to S&P. In fashioning the preliminary injunctive relief, the court ordered the terms of the temporary restraining order to remain in effect until a determination following a trial on the merits was made.

Comex appeals pursuant to 28 U.S.C. § 1292(a).

## DISCUSSION

For a preliminary injunction to issue in this Circuit, the movant must show:

> (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

*Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir. 1979) (per curiam); *see Friarton Estates Corp. v. City of New York,* 681 F.2d 150, 152 n.2 (2d Cir. 1982); *Arrow United Industries, Inc. v. Hugh Richards, Inc.,* 678 F.2d 410 (2d Cir. 1982). Our review of the grant of a preliminary injunction is limited to determining whether the trial court abused its discretion. *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 931–32, 95 S.Ct. 2561, 2563, 45 L.Ed.2d 648 (1975). Further, the trial court's factual findings are subject to the clearly erroneous standard of review. Fed.R.Civ.P. 52(a). *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* ⸺ U.S. ⸺, ⸺, 102 S.Ct. 2182, 2189, 72 L.Ed.2d 606 (1982). Accordingly, we may only disturb a trial court's findings in instances where review of the record leaves "the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

We turn our attention to the two primary legal bases upon which the preliminary equitable relief was grounded, i.e., trademark infringement, including misrepresentation of source, and misappropriation.

## A. *Trademark Claims*

█ The heart of a successful claim based upon §§ 32(1) and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1) and 1125(a), and common law trademark infringement is the showing of likelihood of confusion as to the source or sponsorship of defendant's products. *Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.,* 687 F.2d 563, 574 (2d Cir. 1982); *Berlitz Schools of Languages of America, Inc. v. Everest House,* 619 F.2d 211, 215 (2d Cir. 1980). In the preliminary injunction context, a showing of likelihood of confusion as to source or sponsorship establishes the requisite likelihood of success on the merits as well as risk of irreparable harm. *American Home Products v. Johnson Chemical Co.,* 589 F.2d 103, 106 (2d Cir. 1978); *Omega Importing Corp. v. Petri-Kine Camera Co.,* 451 F.2d 1190, 1195 (2d Cir. 1971).

In the present case, the following factors are relevant to determining whether there existed likelihood of confusion as to the source of defendant's Comex 500 Stock Index and Comex 500 futures contract: (1) the strength of S&P's marks and name; (2) the similarity of Comex' mark to S&P's marks and the use of the S&P name in Comex' promotional literature; (3) the proximity of S&P's products to Comex products; (4) any evidence of actual confusion as to the source or sponsorship of the Comex 500 futures contract and Comex 500 Stock Index; (5) the sophistication of the persons who would trade Comex' futures contracts; and (6) the good or bad faith exhibited by Comex in choosing its mark and using S&P's name in its advertising material. *See generally Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492, 495 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). Each of these factors will be considered in turn.

█ As to the S&P name, Judge Pollack found that "S&P has developed a reputation in the financial community for reliability and veracity." It follows that the district judge believed the S&P name and its marks which incorporate that name are strong and connote a favorable image in the minds of investors and members of the financial community. In addition, Judge Pollack found that the terms "500" and "500 Index" have secondary meaning which would cause persons familiar with stock indices to think of S&P. Based upon the unrebutted testimony of S&P's Senior Vice President, we conclude that this finding was not clearly erroneous.

Although the "Comex 500" mark is devoid of any explicit reference to the S&P mark, the use of "500", often followed by the words "stock index", may well create the possible inference that the Standard & Poor's 500 Index is the sponsor of the Comex 500 contract. While the use of "500" in itself would probably be insufficient to warrant a finding of likelihood of source confusion, Comex' advertising and promotional materials bolster the inference of

sponsorship by S&P. The trial judge found that the Comex advertisements and promotional brochures were "calculated to cause, and will cause, the reader to believe that there is a relationship between S&P and Comex, and that S&P at least endorses the trading of futures contracts based on the Comex 500." Even upon *de novo* review of this documentary material, *see Playboy Enterprises,* at 574 we agree with the trial judge's finding in this regard.

As to product proximity, while Comex is in the business of making markets in various futures contracts and S&P primarily sells and disseminates financial information, source confusion is certainly possible because both parties operate in the financial community. Furthermore, pursuant to a license, the S&P name is used by the CME in its stock index futures contract and S&P has contracted with CME to receive a royalty for each S&P 500 futures contract traded. Thus, to at least this extent, S&P and Comex compete in the same discrete market.

Although plaintiff presented no evidence of actual confusion among investors or traders as to the sponsorship of the Comex 500 contract or index, this would have been difficult since trading of the Comex 500 futures contract has not commenced.

Regarding the sophistication of persons who trade stock index futures, at first glance one might expect them to be fairly sophisticated buyers since each contract is valued at approximately $60,000. However, a trader is only required to tender a margin of approximately 10% of the value of the contract, and, barring radical shifts in the stock market's performance, an investor's exposure could be limited to a few thousand dollars. Additionally, Comex admittedly

seeks to market its stock index futures contract to a broad range of investors, not just to sophisticated futures traders.

Finally, S&P presented no explicit evidence of Comex' bad faith in adopting the Comex 500 mark or using S&P's name throughout its promotional materials. But, an inference of bad faith can be drawn from Comex' reference to a Comex 500 Index in conjunction with references to the S&P 500 Index while knowing all the while that there was no such thing as a Comex 500 Index and from Comex' failure to include in its advertisements or promotional material an express disclaimer of any affiliation between S&P and the Comex 500 stock index futures contract.

In sum, based upon the testimony and Comex' promotional materials placed before him, Judge Pollack did not abuse his discretion in finding a likelihood of confusion as to the source or sponsorship of the Comex 500 stock index futures contract.

However, at least with regard to the trademark claims, the trial court's injunction extended beyond the facts before him. The injunction precluded *any* use of S&P's name or marks. In this Court, Comex contends, for the first time,[2] that all of the source confusion surrounding the Comex 500 stock index contract could be eliminated by the use of disclaimers in Comex' promotional materials. While it is apparent that prominent and adequately displayed disclaimers of any affiliation with S&P in Comex' promotional material might substantially reduce the likelihood of source confusion,[3] and accordingly reduce S&P's chance for success on the merits of the Lanham Act claims, we need not reach Comex' claim of overbreadth since, as discussed below,

**2.** Comex did not explicitly raise its claim of the injunction's overbreadth before the trial court nor did it present to the trial court any proposed written promotional materials containing disclaimers.

**3.** Indeed, in finding likelihood of source confusion, Judge Pollack seemed to rely on the absence of disclaimers, stating in his opinion that "[n]owhere in Comex's advertisement or promotional material did it ever state that it had

no relationship with S&P" and "Comex has never suggested that it is offering futures based on the S&P 500 without the authorization of S&P." In similar circumstances, courts have recognized the need for disclaimers to obviate source confusion. *Chicago Board of Trade v. Dow Jones, Inc.,* No. 82 L 4067 (Cir.Ct. Cook County June 4, 1982); *National. Football League v. Governor of Delaware,* 435 F.Supp. 1372, 1381 (D.Del.1977).

the broad preliminary injunction is adequately supported by S&P's misappropriation claim against Comex.

### B. *Misappropriation*

This Court recently reviewed the misappropriation branch of the unfair competition tort in *Roy Export Co. Establishment of Vaduz, Liechtenstein v. Columbia Broadcasting System, Inc.*, 672 F.2d 1095, 1105 (2d Cir. 1982), *cert. pet. filed*, 50 U.S.L.W. 3936 (U.S. May 14, 1982), stating this "amorphous cause of action" "has been broadly described as encompassing 'any form of commercial immorality,' or simply as 'endeavoring to reap where [one] has not sown;' it is taking 'the skill, expenditures and labors of a competitor' and 'misappropriati[ng] for the commercial advantage of one person . . . a benefit or "property" right belonging to another.' The tort is adaptable and capacious." (Citations omitted).

The seminal case in this area of law is *International News Service v. Associated Press*, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918), in which the Supreme Court affirmed an injunction prohibiting INS from copying news from AP's bulletin boards and early editions of AP members' newspapers and then selling that news—either in verbatim or rewritten form—in competition with AP. The Court expressly rejected INS' contention that once the information which was compiled and disseminated by AP reaches the newspapers "it becomes the possession of all to whom it is accessible" and thus any use may be made of it. *Id.* at 239, 39 S.Ct. at 72. The Court recognized the right of an individual newspaper reader to use the news "for any legitimate purpose not unreasonably interfering with complainant's right to make merchandise of it." *Id.* But, a direct competitor's resale of that news is barred because the defendant "is taking material that has been acquired by complainant as the result of organization and the expenditure of labor, skill, and

money which is salable by complainant for money." *Id.* Thus, the focus of *International News Service* is upon the defendant's use of plaintiff's salable product. *See Bond Buyer v. Dealers Digest Publishing Co.*, 25 A.D.2d 158, 267 N.Y.S.2d 944 (1st Dep't 1966).

■ The evidence in the present case shows that S&P exercises its expertise first by choosing the 500 stocks to be included in its index and then by assigning the weights to be given each stock. To assure the accuracy and integrity of the Standard & Poor's 500 Index, S&P uses 25–30 analysts and a staff of twelve chartists and statistical clerks. The S&P manager responsible for calculating the Index for the past twelve years testified that even he would be unable to calculate the Index' value the day after he left S&P's employ. Thus, there is little question that S&P expends a significant amount of money, labor and expertise in calculating the 500 Index—an index respected for its accuracy, as the trial judge found.

S&P disseminates the S&P 500 Index to some entities, such as newspapers, free of charge; others receive the data by purchasing S&P's various publications which S&P promotes through advertising. In 1981, S&P's sales revenues for its lead publication, *Outlook*, exceeded $5 million. In addition, pursuant to a contractual arrangement with S&P, General Telephone & Electronics sells a minute-to-minute calculation of the Standard & Poor's 500 Index. Thus, the Standard & Poor's 500 Index appears to be a salable product.

While S&P has traditionally been in the business of disseminating financial information, it now has a significant interest in the futures contracts business by virtue of its licensing agreement with CME. Pursuant to that arrangement, S&P receives a fixed annual fee from CME plus a royalty based upon the number of S&P 500 futures contracts traded on the CME.[4] Therefore, S&P and Comex are, at least to this extent, in competition.

---

**4.** Although there is apparently some ambiguity as to whether S&P has licensed its name or its 500 Index or both to CME, there is no question

that S&P has a financial interest in the success of the S&P 500 futures contract.

Comex proposes to use the value of the Standard & Poor's 500 Index as the settlement price of its futures contract. From Comex' point of view, this use is very limited and no different than an individual investor's use of that number to compare the stock market's overall performance to his or her own portfolio. From S&P's standpoint, Comex' proposed use is no different than INS' condemned conduct in *International News Service*: Comex is taking S&P's Index, on which S&P expends substantial money, labor and expertise, and is planning to use it as an integral part of a commercial venture which competes directly with CME's S&P 500 futures contract, in which S&P has a significant financial stake.

At this stage, in reviewing the grant of a preliminary injunction for an abuse of discretion, this Court need not resolve the merits of the foregoing dispute. We simply note that at a minimum S&P's claim of misappropriation presents sufficiently serious questions going to the merits to make them a fair ground for litigation.

■ We further conclude, based upon our review of the record, that Judge Pollack did not err in finding that the balance of hardships tips decidedly toward S&P. Absent the preliminary injunction, trading of the Comex 500 Stock Index futures contract would begin in direct competition with CME's S&P 500 contract. As a result, the trading volume of the CME would be adversely affected, thereby causing S&P to lose revenues under its licensing agreement. Because realistically it would not be possible to measure the actual amount of lost sales on the CME, the injury to S&P would likely be irreparable. In addition, commencement of Comex 500 trading would likely eliminate S&P's opportunities to license its name and other indices to other futures exchanges. Furthermore, as recognized by the trial court, if a problem arose in the trading of Comex 500 futures contracts, S&P might be a target of litigation since the Standard & Poor's 500 Index forms an integral basis of the contract. Comex' claim of hardship due to its delayed entry into the stock index futures market—

characterized by the trial judge as "overdrawn"—falls far short of markedly altering the balance of hardships under the circumstances presented here.

Finally, with respect to S&P's charge of misappropriation, we conclude that Judge Pollack did not err in finding irreparable harm. The likely irreparable harm to S&P's private interests emanates from the considerations discussed hereinabove with regard to the balance of hardships. Additionally, a significant risk of irreparable harm to the public supports the preliminary injunction.

■ Although this Circuit's settled preliminary injunction standard does not explicitly mention the public interest, as do other Circuits' standards, *e.g., Garcia v. Barcelo*, 671 F.2d 1, 2 (1st Cir. 1982); *Mobil Corporation v. Marathon Oil Co.*, 669 F.2d 366, 369 (6th Cir. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 1490, 71 L.Ed.2d 691 (1982); *In re Uranium Antitrust Litigation*, 617 F.2d 1248, 1260 (7th Cir. 1980), we have recognized that, as a court of equity, we "may go much further both to give or to withhold relief in furtherance of the public interest than where only private interests are involved." *Brown & Williamson Tobacco Corp. v. Engman*, 527 F.2d 1115, 1121 (2d Cir. 1975), *cert. denied*, 426 U.S. 911, 96 S.Ct. 2237, 48 L.Ed.2d 837 (1976); *see Stamicarbon, N. V. v. American Cyanamid Co.*, 506 F.2d 532, 537 (2d Cir. 1974); *United States v. City of New Haven*, 447 F.2d 972, 974 (2d Cir. 1971). Here, without a preliminary injunction, trading of Comex 500 futures contracts would commence immediately. If S&P ultimately prevails on the merits and a permanent injunction is entered, the orderly conduct of the Comex 500 futures market and the financial positions of thousands of traders involved in contracts to be closed or settled over a 23 month period would be drastically affected. As noted by the trial court, at a *minimum*, traders would be locked into existing futures contracts. Comex has not pointed us to, nor are we able to envision, any simple effective remedy for compensating traders who might be injured in such a circum-

stance. The need to protect the public from such an eventuality is a strong ground for the maintenance of a preliminary injunction.

In sum, the record indicates the presence of sufficiently serious questions going to the merits of S&P's misappropriation claim to make them a fair ground for litigation, a balance of hardships tipping decidedly in S&P's favor, and irreparable harm to S&P and the public.[5] Accordingly, the trial court did not abuse its discretion in entering the preliminary injunction.

Affirmed.

NEWMAN, Circuit Judge (concurring):

When Standard & Poor's enters the business of publishing an index of selected stock issues, there can be little doubt that another company endeavoring to publish the same index would face liability for misappropriation no matter how it merchandised its product and would face liability for trademark infringement if its merchandising created a risk of confusion between its product and that of Standard & Poor's. However, when Standard & Poor's makes its stock index known to the public, different, novel, and, in my judgment, close questions are presented when another company enters a business other than the publishing of stock indices—here, the marketing of futures contracts—and in its business uses the Standard & Poor's index as a reference point—here, the settlement price for the contracts. And the issues remain different, novel, and close notwithstanding the fact that Standard & Poor's itself has elected to contract with another entity for the marketing of futures contracts based on the Standard & Poor's stock index. The issues in this case include the issue of whether Standard & Poor's has the type of interest in its index that is capable of being protected by license against the unlicensed use by Comex in marketing a futures contract using the Standard & Poor's index as a settlement price.

I fully agree that the public interest concerns expressed by Judge Pierce weigh heavily in favor of maintaining the status quo pending prompt resolution of the merits, and for that reason concur in the result.

WHITMAN KNAPP, District Judge, sitting by designation (concurring):

I concur in the result for the reasons expressed by Judge Newman.

---

**5.** Comex' claim that equitable relief should be denied S&P due to plaintiff's laches, *see Columbia Pictures Industries, Inc. v. American Broad-* *casting Co.*, 501 F.2d 894, 899 (2d Cir. 1974), is without merit.