**GOLDEN NUGGET, INC., a Nevada corporation, Plaintiff-Appellant,**

**v.**

**AMERICAN STOCK EXCHANGE, INC., a New York Corporation; the Options Clearing, Corporation, a Delaware corporation, Defendants-Appellees.**

**No. 86–1561.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 11, 1987. Decided Sept. 23, 1987.

Jayson Burton Lumish, Los Angeles, Cal., for plaintiff-appellant.

John J. Loflin, New York City, for defendants-appellees.

Before FLETCHER, BEEZER and THOMPSON, Circuit Judges.

PER CURIAM:

Appellants appeal the district court's dismissal of their claims for misappropriation, unfair competition, and trademark violation against the American Stock Exchange and the Options Clearing Corporation. Issuing and trading options on Golden Nugget stock without Golden Nugget's consent is the conduct that gives rise to the claims. We affirm.

## FACTS

Golden Nugget is a New York Stock Exchange listed corporation active in the gaming and hotel industry. In 1973, the American Stock Exchange and the Option Clearing Corporation (collectively "AMEX") commenced the issuance, listing, and trading of put and call options on Golden Nugget common stock. The Options Clearing Corporation issues the options which are publicly traded on the American Stock Exchange. AMEX did not obtain

Golden Nugget's consent prior to trading Golden Nugget options. Golden Nugget claims that AMEX's failure to secure its consent before trading options on its stock constitutes a misappropriation of Golden Nugget property, infringes the Golden Nugget tradename and constitutes unfair competition, in violation of Nevada law.

The district court granted AMEX's motion for summary judgment on the ground that section 9(g) of the Securities Exchange Act of 1934, 15 U.S.C. § 78i(g) (SEA), preempts appellant's state common law claims. It did not address the claims on the merits.

## DISCUSSION

### I. *Preemption*

Appellant claims that the district court erred in finding that section 78i(g) [1] of the SEA leaves no room for the state to regulate, by statute or by common law, the options-trading market. We have enough doubts about the district court's conclusions in this regard that we feel constrained to reach and to dispose of the case on the merits. We outline the reasoning that suggests to us that there is no preemption. However, since we conclude that plaintiff cannot win on the merits and that there is no state policy to be preempted, we need not, and do not decide whether or not state common law would be preempted.

■■■ In determining whether federal law preempts state law in a particular area, we look to Congress's intent. Here we specifically look to the statute dealing with options trading, but we must look also more broadly at the federal regulatory scheme for securities since preemption is not clear on the face of the statute. We must examine whether federal regulation in the area is so pervasive as to create an inference that Congress intended to "occupy the field" completely. *See City of Bur-*

bank v. Lockheed Air Terminal, Inc., 411 U.S. 624, 633, 93 S.Ct. 1854, 1859, 36 L.Ed.2d 547 (1973) (finding that pervasive federal regulation of aircraft noise preempts state and local control); *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 236, 67 S.Ct. 1146, 1155, 91 L.Ed. 1447 (1947) (finding Federal Warehouse Act expressly preempts all concurrent state regulation). Even if federal regulations are not pervasive, we do not permit states to enforce their laws if the state law conflicts with the federal law by standing as an obstacle to the full accomplishment of federal regulatory objectives, *see Hines v. Davidowitz*, 312 U.S. 52, 74, 61 S.Ct. 399, 407, 85 L.Ed. 581 (1941), or if compliance with the state law prevents compliance with federal law. *See Florida Lime & Avocado Growers v. Paul*, 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963). Similarly, when there is an overriding federal interest in the subject of the legislation, the Court finds preemption. *See, e.g., Pennsylvania v. Nelson*, 350 U.S. 497, 76 S.Ct. 477, 100 L.Ed. 640 (1956) (Congressional enactment of internal security laws to safeguard against overthrow of the government by force reflected overriding federal interest requiring preemption of supplementary state anticommunist legislation).

The district court, in holding that section 78i(g) of the SEA preempts state law in the field of regulating options, apparently found both occupation of the field and conflict between state and federal goals. We suggest the answer is not as clear as the district court would have it. A review of the language of section 78i(g), its legislative history, and the announced position of the SEC suggests that state and federal law could coexist were the state law as plaintiff represents it to be.

The district court cites the language "[n]otwithstanding any other provision of

---

**1.** The text reads:

Notwithstanding any other provision of law, the Commission shall have the authority to regulate the trading of any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency (but not, with respect to any of the foregoing, an option on a contract for future delivery).

law, the Commission shall have the authority ..." in section 78i(g) as evidence of Congress's intent that the SEC's authority to regulate the options market cannot be shared. The legislative history of section 78i(g) does not seem to support this reading. The purpose of the statute as shown by the legislative history was specific and focused. Congress wanted to overrule a Seventh Circuit case that deprived the SEC of authority to regulate trading in options on Government National Mortgage Association pass-through certificates that were backed by mortgages (GNMAs), *Board of Trade v. Securities and Exchange Comm'n,* 677 F.2d 1137 (7th Cir.), *vacated as moot,* 459 U.S. 1026, 103 S.Ct. 434, 74 L.Ed.2d 594 (1982). Under the SEA the SEC had the authority to regulate securities. However, the definition section of the securities laws did not include expressly the word "option" within the definition of "security." Under the Commodity Exchange Act the Commodities Futures Trading Commission (CFTC) had "exclusive jurisdiction with ... respect to accounts, agreements ... and transactions involving contracts of sale of a commodity for future delivery...." 7 U.S.C. § 2. The issue in the case was whether this grant of exclusive jurisdiction to the CFTC extended to the regulation of options on GNMA securities, thereby excluding the SEC from exercising regulatory authority. The Seventh Circuit found that the CFTC had exclusive jurisdiction. 677 F.2d at 1146. Congress reacted to this decision by passing section 78i(g) in order to preserve the jurisdiction of the SEC. Congress defined "securities" to include options, thereby reposing regulation in the SEC. In this context, then, the language, "notwithstanding any other provision of law" was inserted to insure that the SEC could regulate options, not to exclude all other possible regulation.

Other contemporaneous amendments to the SEA also suggest to us that all other regulation was not excluded. At the same time that Congress added section 78i(g) it amended 15 U.S.C. § 78bb(a) to preempt expressly certain state laws that prohibit or regulate wagering or gaming contracts or the operation of bucket shops that might otherwise be applied to invalidate any put, call, option, straddle or other security. The legislative history explains that this provision was added because "there should be a federal policy with respect to instruments trading in interstate commerce. Thus, options contracts approved for trading by the SEC pursuant to the rules of national securities exchanges ... should not be prevented from trading by state laws which were historically designed to prevent unregulated gambling activities." H.R.Rep. No. 626, 97th Cong., 2d Sess., pt. 1, at 9, *reprinted in* 1982 U.S.Code Cong. & Admin.News 2780, 2787. This amendment, rather than banning all state regulation, pinpointed specific state laws that were preempted. The fact that Congress focused on the anti-gaming and bucket shop laws suggests that Congress recognized that certain state laws should not be allowed to affect the regulation of options. This seems inconsistent with an intent to preempt totally state laws.

Beyond concluding that Congress probably did not intend that the SEC occupy the entire field of options regulation, we have considered whether the enforcement of the state law claims pressed here would interfere impermissibly with the SEC's regulatory authority. Plaintiff is asserting that it has a property interest in its stock under state law that entitles it to prevent others from trading in options on its stock without its consent. Plaintiff claims this activity in options in its stock constitutes misappropriation, tradename infringement, and unfair competition under state law.

Apparently the SEC itself, at least in certain contexts, sees no conflict between its regulation of options and requirements of consent by issuers. The proposed regulations of an independent entity, the National Association of Securities Dealers (NASD), that it would not allow trading in listed options on over-the-counter securities without the issuer's consent is not opposed by the SEC.[2] The SEC concluded that al-

---

2. *See* Exchange Act Release No. 34–22026, 50      Fed.Reg. 20310 (May 15, 1985), in which the

though the Act does not require issuer consent, and even though the wisdom of the NASD's requirement of consent is doubtful, it found no regulatory reason for prohibiting the NASD's requirement. Under these circumstances, we are hesitant to affirm the district court on the basis that state common law would necessarily conflict with the federal regulatory scheme.

## II. State Claims

The district court, because of its finding of preemption, did not reach the merits of plaintiff's claims of misappropriation, violation of trademark laws, and unfair competition. Appellee urges this court, if it does not affirm on the preemption basis, in the alternative, to uphold the judgment of the district court on the grounds that there are no material disputed facts and that the undisputed facts fail to support a claim for relief. Appellant asserts that as issues of material fact remain, summary judgment is inappropriate. We review grants of summary judgment *de novo*. *Lojek v. Thomas*, 716 F.2d 675, 677 (9th Cir.1983).

■ However, the appellees ask more of us. They would have us, if we are unable to affirm on the basis of the district court decision, affirm on an alternate basis. We clearly have the power to do so. *Thigpen v. Roberts*, 468 U.S. 27, 30, 104 S.Ct. 2916, 2918, 82 L.Ed.2d 23 (1984); *Schweiker v. Hogan*, 457 U.S. 569, 584–85, 102 S.Ct. 2597, 2607, 73 L.Ed.2d 227 (1982). Whether, as a prudential matter, we should do so

depends on the adequacy of the record and whether the issues are purely legal, putting us in essentially as advantageous a posture to decide the case as would be the district court. We find no dispute as to material facts; we find, further, that rulings to be made are legal in nature; they relate to claims that the district court has characterized as "novel and intriguing." Since the issues have been briefed fully and argued to us, we probably are in a better position than the district court to decide them. In the interests of judicial economy, we conclude that we should do so.

■ Appellant's claims are so novel that it is not surprising that neither side suggests the existence of any Nevada law that might aid our deliberations. Cases cited to us from other jurisdictions are at best only tangentially relevant. To succeed on any of its claims, Golden Nugget must persuade us that it has a property or other protectable interest in Golden Nugget common stock owned by its shareholders. Appellees deal only in the property of Golden Nugget's shareholders, not in property owned by the corporation. Plaintiff does not suggest that it has retained any proprietary rights in the shares of its stock that would allow it to control the manner or means of resale of its shares. We find it impossible to conceptualize a property right of the plaintiff that has been misappropriated.

SEC approved the regulations promulgated by the NASD including a requirement that issuers consent to the trading of options in their stock as a condition of their being traded on over-the-counter exchanges. The NASD is a self-regulatory organization—subject to SEC oversight. *See* Securities Exchange Act of 1934, § 19, 15 U.S.C. § 78s. Section 78s gives the SEC oversight responsibility with respect to all rule making activity of national exchanges. Not only must self regulatory associations file proposed rule changes with the SEC but the Act gives the SEC the authority to "abrogate, add to, and delete from ... the rules of self-regulatory organizations." 15 U.S.C. § 78s(c).

In considering the NASD's proposal, the SEC specifically took note of the present case. Footnote 41 to the Release reads: "In this regard, the Commission notes that the question of whether an exchange can commence trading options

without an issuer's consent is currently in litigation. *See Golden Nugget, Inc. v. Amex*, No. 83 (S.D. 647 Nev., September 1983). We note that this litigation apparently does not involve claims arising under the federal securities laws." 50 Fed.Reg. at 20313 n. 41. This footnote refers to the textual statement that "[b]ecause the exchanges have not proposed an issuer consent requirement themselves, in order for the Commission to precondition approval of their OTC options proposals on such a requirement the Commission would have to determine that such a provision is required by the Act. The Commission, however, is unable to conclude that the Act requires that the exchanges adopt rules that would require issuer consent before options could be traded on their stock, or that would give issuers a role in selecting which market[s] would be allowed to trade options on their stock." 50 Fed.Reg. at 20313.

In *International News Service v. Associated Press*, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918) and *Board of Trade v. Dow Jones & Co.*, 98 Ill.2d 109, 74 Ill.Dec. 582, 456 N.E.2d 84 (1983), cases on which appellant relies for its misappropriation claim, there was an identifiable property interest that had been misappropriated. *Associated Press* involved the copying of news stories from the Associated Press's bulletin boards; *Dow Jones* involved using the Dow Jones index as the basis of a stock index futures contract. In each instance, the plaintiff had a proprietary interest in its own product that was being used to the commercial advantage of the appropriator and to the disadvantage of its owner. This case is different. Quite simply, appellant's misappropriation claim fails because it had no property interest that could be misappropriated.

■ Appellant's claim of trademark violation is equally unsuccessful. Surely a dealer in a product can describe it accurately by its tradename—shares of Golden Nugget common stock are not unlike second-hand BMW's or Chevrolets. Describing the product nondeceptively and by name brand has never been a violation of a manufacturer's trademark. We see no distinction between shares of stock and second-hand cars in this regard. We reject appellant's argument that Golden Nugget options are a new product, distinct and separate from Golden Nugget stock, that has appropriated the Golden Nugget name. Appellant suggests that the fact some Golden Nugget options are not exercised is significant to the analysis. It apparently sees this as proof that the option is a separate product. We think this is reaching. An option at most is a right to buy or sell Golden Nugget shares.

■ Appellant, finally, claims that options compete unfairly in the securities market against its warrants and options. Even were we to accept that such competition exists, to sustain a claim of *unfair* competition, there would have to be some grounding in deception or appropriation of appellant's property. We find none. Although we acknowledge freely that the tort

of unfair competition is extremely flexible, and courts are given wide discretion to determine whether conduct is "unfair," *see* 1 J. McCarthy, *Trademarks and Unfair Competition*, §§ 1.3–1.4 (2d ed. 1984), nothing on this record suggests unfair conduct. To have a tort there must be a wrong. We find nothing dishonest or unfair in the actions of AMEX.

### CONCLUSION

We uphold the grant of summary judgment. We find appellant's state law claims meritless.

AFFIRMED.