451 F.3d 295
 DOW JONES & COMPANY, INC., Plaintiff-Appellant,
v.
INTERNATIONAL SECURITIES EXCHANGE, INC., and Options Clearing Corporation, Defendant-Appellees.
The McGraw-Hill Companies, Inc., Plaintiff-Appellant,
v.
International Securities Exchange, Inc., Defendant-Appellee.
Docket No. 05-4812-CV.
Docket No. 05-4972-CV.
 United States Court of Appeals, Second Circuit.
 Argued: January 27, 2006.
 Decided: June 16, 2006.
 
 COPYRIGHT MATERIAL OMITTED Robert P. Lobue, Patterson Belknap Webb & Tyler LLP (Stuart A. Karle, General Counsel, The Wall Street Journal; Deborah T. Revesz, Assistant General Counsel, Dow Jones & Company, Inc.; Adeel A Mangi, Joanne N. Kwong, Patterson Belknap Webb & Tyler LLP, of counsel), New York, NY, for Plaintiff-Appellant Dow Jones & Company, Inc.
 R. Bruce Rich, Weil, Gotshal & Manges LLP (Irwin H. Warren, Elizabeth S. Weiswasser, Benjamin E. Marks, of counsel), New York, NY, for Plaintiff-Appellant The McGraw-Hill Companies, Inc.
 Andrew L. Deutsch, DLA Piper Rudnick Gray Cary U.S. LLP (Michael J. Simon, General Counsel, International Securities Exchange, Inc.; Monica P. McCabe, Christine M. Jaskiewicz, DLA Piper Rudnick Gray Cary U.S. LLP, of counsel), New York, NY, for Defendant-Appellee International Securities Exchange, Inc.
 Peter J. Toren, Sidley Austin Brown & Wood LLP (Tracey Russell Seraydarian, of counsel), New York, NY, for Defendant-Appellee The Options Clearing Corporation.
 Douglass B. Maynard, Akin Gump Strauss Hauer & Feld LLP (Karol A. Kepchar, James J. Benjamin, Jr., Rex S. Heinke, Michael D. Lockard, of counsel), New York, NY, for Amici Curiae The Nasdaq Stock Market, Inc., Wilshire Associates Incorporated, The FTSE International Limited and Barclays Global Investors, N.A.
 David E. Jacoby, Schiff Hardin LLP (Paul E. Dengel, of counsel), New York, NY; Michele L. Odorizzi, Mayer Brown Rowe & Maw, Chicago, IL; for Amici Curiae Chicago Board Options Exchange, Inc., and Board of Trade of the City of Chicago, Inc.
 Edward F. Maluf, Bingham McCutchen (Nia Cross, Susanna Y.Y. Chu, of counsel), New York, NY, for Amici Curiae Archipelago Holdings, Inc., Pacific Exchange, Inc., Boston Stock Exchange, Inc., and Boston Options Exchange Group, LLC.
 David M. Battan, General Counsel, Interactive Brokers Group LLC, Washington, D.C., for Amicus Curiae Interactive Brokers Group LLC.
 Before LEVAL, SOTOMAYOR, Circuit Judges, and KRAVITZ, District Judge.[1]
 LEVAL, Circuit Judge.
 
 
 1
 This appeal raises a narrow and highly specific question—whether an options exchange, by creating, listing, and facilitating the trading of options on shares in an exchange traded fund ("ETF") designed to track a proprietary market index, misappropriates intellectual-property rights of the creator of the index. The district court found no such infringement, and we agree.
 
 
 2
 Plaintiffs Dow Jones & Company, Inc. ("Dow Jones") and The McGraw-Hill Companies, Inc. ("McGraw-Hill") appeal from the rulings of the United States District Court for the Southern District of New York (Harold Baer, J.), which dismissed their complaints against defendants International Securities Exchange, Inc. ("ISE"), an options exchange, and Options Clearing Corporation ("OCC"), an options clearing agency. Dow Jones appeals also from the denial of its motion for a preliminary injunction.[2]
 
 
 3
 Each plaintiff is the originator of a widely known index, which reflects an average of the stock market value of the shares in major United States companies. Dow Jones is the creator of the Dow Jones Industrial Average ("DJIA"), which reflects the averages of the stock market value of the shares of thirty leading United States companies. McGraw-Hill, through its Standard & Poor division ("S & P"), is the creator of the S & P 500 Index ("S & P 500"), which reflects the average of the stock market value of the shares of 500 leading United States companies. Dow Jones and McGraw-Hill have each licensed the creation of an ETF, designed to track the performance of its index, and to provide a vehicle for public investment in a pool of securities which reflects the performance of the index. The ETF in each case consists of a basket of securities, being shares of the companies used to calculate the market average, weighted in the same proportions as in the average. Dow Jones licensed the creation of the DIAMONDS ETF, which tracks the performance of the DJIA, and McGraw-Hill licensed the creation of an ETF under the name Standard & Poor Depositary Receipts, or SPDR (pronounced "spider"), which tracks the performance of the S & P 500. By purchasing shares in the DIAMONDS and SPDR funds, members of the public are able to buy and sell shares that are backed by the securities which make up the DJIA and the S & P 500, and therefore rise and fall with those indexes.[3]
 
 
 4
 Defendant ISE, an options trading exchange, which creates and markets its own indexes, announced in 2005 its intention to offer options trading on shares of DIAMONDS and SPDRs. Defendant OCC, a clearing organization for options trading, announced that it would clear trades in those options on the ISE. Options are contracts which give the purchaser of the option the right, but not the obligation, to buy or sell a security at a specified price (the "strike price"), on or before a specified date. The buyer of a call option has the right to buy the optioned security at a specified price at or before a specified date. The buyer of a put option has the right to sell the optioned security at a specified price at or before a specified date. Although in theory an option contract is to be settled by the purchase or sale of the optioned security in accordance with the rights created by the option contract, in practice settlement is generally effectuated by a cash payment representing the difference between the market price and the strike price.
 
 
 5
 Following ISE's announcements of its intention to institute trading in options for DIAMONDS and SPDRs, the plaintiffs brought this suit. The complaints allege that by issuing and trading options on DIAMONDS and SPDRs the defendants will misappropriate plaintiffs' intellectual-property interest in the underlying indexes and engage in unfair competition. They allege as well that through the marketing of these options, the defendants will infringe on, and dilute, plaintiffs' trademarks. We conclude that the defendants' intended actions alleged in the complaints do not infringe on any intellectual-property interest or trademark of the plaintiffs.
 
 Background
 A. Factual Background
 
 6
 The facts asserted in the complaints, viewed in the light most favorable to plaintiffs, are recited below in greater detail.
 
 1. McGraw-Hill & SPDRs
 
 7
 McGraw-Hill is a company engaged in educational publishing, financial services, business information, and media services. One of its divisions is S & P, which develops and publishes financial indexes, investment analysis, debt ratings, and other financial services. S & P has been calculating and maintaining the S & P 500 Index since 1957. The S & P 500 Index includes a representative sampling of leading companies in major industries and is regarded as a leading benchmark for measuring the stock performance of large United States companies. The composition of the S & P 500 is regularly reviewed and revised by the S & P 500 Index Committee, which from time to time eliminates the stock of a company from the index, replacing it with another. The committee regularly adjusts its calculation of the S & P 500 to reflect changes affecting the capitalization of the component companies.
 
 
 8
 S & P licenses the use of the S & P 500 to financial institutions as a benchmark against which to measure the performance of publicly traded stocks. It also licenses the use of the S & P 500 as the basis for financial products that utilize the index. These licenses include grants of the right to use the S & P marks in the names of such products and in connection with a licensee's marketing and promotional efforts.
 
 
 9
 In 1993, by licensing the American Stock Exchange LLC ("Amex"), S & P authorized the creation of the SPDR fund, an ETF designed to track the performance of the S & P 500. The SPDR fund holds a basket of securities that reflects the components of the S & P 500 and their relative weighting within the index. Shares in the SPDR fund, known as SPDRs, thus constitute ownership interests in a unit investment trust holding a portfolio of securities virtually identical to the makeup of the S & P 500. Shares of the SPDR fund are traded on the Amex, just as if they were shares of common stock in a listed company. "SPDR" is a registered trademark of McGraw-Hill.
 
 
 10
 In early January 2005, ISE announced its intention to institute trading in options on SPDR shares. OCC, which clears options trades on ISE and other exchanges, announced that it would clear SPDR option trades on ISE.
 
 
 11
 On January 6, 2005, McGraw-Hill filed its complaint in the Southern District of New York to enjoin the defendants from instituting trading in SPDRs options.[4] Its complaint alleges that by creating, listing, and trading SPDR options, the defendants will misappropriate McGraw-Hill's intellectual property and engage in unfair competition under New York law. The complaint also claims that in marketing and promoting SPDR options, ISE will infringe and dilute McGraw-Hill's trademark rights under federal and state law.[5]
 
 
 12
 McGraw-Hill moved for a preliminary injunction, and the district court granted a Temporary Restraining Order ("TRO") pending a ruling on the motion. Prior to the expiration of the TRO, McGraw-Hill and ISE entered into a temporary license agreement permitting ISE to trade SPDR options during the pendency of the litigation without prejudice to the parties' respective positions. ISE moved to dismiss McGraw-Hill's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).
 
 2. Dow Jones and DIAMONDS
 
 13
 Dow Jones gathers and publishes business and financial news information. Since 1896, Dow Jones has produced and published the DJIA. Since 1928, the DJIA has been based on the stocks of thirty companies, determined by Dow Jones to be leaders in their respective industries. The DJIA is a leading gauge of United States stock market performance. Dow Jones monitors the components of the DJIA and makes changes in the composition of the index for various reasons, including corporate acquisitions and shifts in a component company's core business, or to enhance the DJIA's reflection of the overall market. Dow Jones regularly adjusts the calculation of the DJIA to reflect changes affecting the capitalization of the component companies.
 
 
 14
 Dow Jones distributes the DJIA to a variety of real-time and delayed market data vendors pursuant to license agreements. Those vendors then redistribute the DJIA as permitted by those licenses. The standard license agreement used by Dow Jones requires information vendors and their subscribers to agree that they will not "use the Index[] as the basis of financial instruments or investment products (e.g., passively-managed funds) without a separate written agreement with Dow Jones for such purpose." Dow Jones also licenses the use of the DJIA for the creation of investment products that track the DJIA.
 
 
 15
 In 1997, by exclusive license agreement with the Amex, Dow Jones created the DIAMONDS fund, designed to track the DJIA. Like common stock in corporations, DIAMONDS shares are bought and sold on the Amex. By purchasing DIAMONDS shares, members of the public invest in a security which will move in tandem with the movements in the DJIA without having to purchase shares in the thirty companies that make up the DJIA. "DIAMONDS" is a registered trademark of Dow Jones.
 
 
 16
 Dow Jones has also exclusively licensed the Chicago Board Options Exchange ("CBOE") to create, issue, trade, market, and promote options on the DJIA, as well as options on DIAMONDS shares.[6] The CBOE engages in advertising to promote DIAMONDS options to prospective investors and to develop market depth and liquidity. Under the exclusive license, Dow Jones retains the right to review CBOE's marketing materials relating to DIAMONDS options, and to be indemnified by CBOE for claims arising from CBOE's actions. As with the CBOE market for DIAMONDS options, every investment product available in the United States based on the DJIA has been expressly authorized by a license from Dow Jones.
 
 
 17
 In May 2005, while McGraw-Hill's motion to dismiss was pending, ISE, which had no license for such activity, announced that it would begin to issue and trade options on DIAMONDS, and OCC announced that it would clear those trades. On May 24, Dow Jones brought suit, seeking to enjoin the defendants from issuing, listing, trading, marketing, promoting, and clearing DIAMONDS options. Dow Jones's complaint is almost identical to that of McGraw-Hill. It claims that defendants' proposed actions constitute unfair competition and misappropriation of Dow Jones's intellectual property in creating, maintaining, and disseminating the DJIA, as well as trademark infringement and dilution under federal and state law.[7] Dow Jones moved for a preliminary injunction; the district court granted a temporary restraining order pending its resolution of the motion.
 
 B. The District Court Opinion
 
 18
 The actions by Dow Jones and McGraw-Hill were consolidated on June 7, 2005 pursuant to Federal Rule of Civil Procedure 42(a), and on June 8 and 13 the district court conducted a preliminary injunction hearing on Dow Jones's motion. On September 1, 2005, the district court issued a single opinion denying Dow Jones's motion for a preliminary injunction and dismissing McGraw-Hill's complaint. See The McGraw-Hill Cos., Inc. v. Int'l Secs. Exch., Inc., Nos. 05 Civ. 1129, 05 Civ. 4954, 2005 WL 2100518 (S.D.N.Y. Sept.1, 2005). In dismissing McGraw-Hill's complaint, the district court added that "if a similar motion is made with respect to Dow's allegations against ISE and OCC, it will likely come to the same result." Id. at *9. On September 7, 2005, Dow Jones, ISE, and OCC stipulated, and the district court so-ordered, that the September 1 decision be deemed a dismissal of Dow Jones's complaint against ISE and OCC under Rule 12(b)(6) for the reasons stated in the district court opinion.
 
 
 19
 McGraw-Hill appeals from the dismissal of its complaint; Dow Jones appeals both from the denial of a preliminary injunction and the dismissal of its complaint.
 
 DISCUSSION
 
 20
 We agree with the district court's conclusion, although not necessarily with every aspect of its reasoning, that the complaints fail to state a claim upon which relief may be granted and were therefore properly dismissed. Each complaint asserts two theories of wrongdoing. The first is that, by creating and maintaining the contemplated options markets, the defendants would misappropriate plaintiffs' intellectual property in their proprietary indexes and the ETFs tracking those indexes, and engage in unfair competition. The second is that defendants will infringe on, and dilute, plaintiffs' trademarks. Both sets of allegations are legally insufficient.
 
 
 21
 A. Misappropriation of Plaintiffs' Intellectual Property in Their Indexes
 
 
 22
 Plaintiffs claim that in issuing options contracts and providing a marketplace for trading such contracts, defendants engage in unfair competition and misappropriation of the plaintiffs' intellectual property. Plaintiffs have invested time, money, and intellectual creativity into the creation and maintenance of their indexes. Each argues that this gives it an intellectual-property right in the index itself, as well as in an ETF that tracks the index, and in options on shares of such an ETF. We assume, for purposes of this decision— though we do not reach this issue—that each of the plaintiffs possesses an exclusive intellectual-property right in the index it created and in the ETF which has been structured to duplicate the index.
 
 
 23
 Plaintiffs argue that because they have an intellectual-property right in the index and the ETF that tracks the index, defendants may not create, list, trade, and clear options on the ETF shares without licenses from plaintiffs. In order to succeed on their misappropriation and unfair competition claims, plaintiffs must establish some wrongful appropriation or use of the plaintiffs' intellectual property. See Telecom Int'l Am., Ltd. v. AT & T Corp., 280 F.3d 175, 198 (2d Cir.2001) (affirming grant of summary judgment to defendant on plaintiff's unfair competition and misappropriation claims where plaintiff failed to show "some appropriation of an idea or knowledge in which [plaintiff] had a property interest or a contractual arrangement creating such an interest"); Roy Export Co. Establishment v. Columbia Broad. Sys., 672 F.2d 1095, 1105 (2d Cir.1982) ("An unfair competition claim involving misappropriation usually concerns the taking and use of the plaintiff's property to compete against the plaintiff's own use of the same property."); Metropolitan Opera Ass'n v. Wagner-Nichols Recorder Corp., 199 Misc. 786, 101 N.Y.S.2d 483, 493 (N.Y.Sup.Ct.1950) ("Clearly, some property rights in the plaintiffs and interference with and misappropriation of them by defendants are necessary to a cause of action."), aff'd, 279 A.D. 632, 107 N.Y.S.2d 795 (1st Dep't 1951). In our view, the conduct attributed to the defendants in the complaints does not constitute a wrongful use or misappropriation under New York law of an intellectual-property interest of the plaintiffs. As a matter of law, therefore, plaintiffs cannot prevail on these claims.[8]
 
 
 24
 By authorizing the creation of ETFs using their proprietary formulas, and the sale of the ETF shares to the public, the plaintiffs have relinquished any right to control resale and public trading of those shares, notwithstanding the fact that plaintiffs' intellectual property may be embedded in the shares. Owners and would-be owners of ETF shares are free to negotiate with one another for the purchase and sale of the ETF shares plaintiffs have sold to the public. Because plaintiffs have permitted the buying and selling of the ETF shares, plaintiffs may not prevent exchanges from offering marketplaces for buyers and sellers to come together to effectuate their transactions. See Nasdaq Stock Market, Inc. v. Archipelago Holdings, LLC, 336 F.Supp.2d 294, 303-04 (S.D.N.Y.2004) ("Archipelago").
 
 
 25
 While an option to purchase or sell ETF shares is undoubtedly a new security, distinct from the ETF share itself, in essence it is nothing more than a means of conditional trading in ETF shares. Instead of directly buying and selling the ETF shares, parties enter into contracts creating a right to buy or sell the ETF shares on a future date. We see no reason why the plaintiffs' authorization of public sale of the ETF shares, which contain their proprietary technology, does not necessarily permit option trading in these shares— including the provision of marketplaces and mechanisms for such trading—just as it authorizes straightforward buying and selling of the shares.
 
 
 26
 Plaintiffs claim that in creating options on the ETF shares, the defendants will misappropriate their indexes. The possibility that, because of their approximate equivalency, defendants might consult the published index values, as a substitute for consulting ETF values, does not make it an infringement of the plaintiffs' rights in the indexes for the defendants to create and host the trading of such options. Plaintiffs intentionally disseminate their index values to inform the public. They cannot complain when the defendants do nothing more than draw information from that publication of the index values. The complaints do not specify any use of the indexes likely to be made by the defendants that would constitute misappropriation.[9] Cf. Int'l News Serv. v. Associated Press, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918); Nat'l Basketball Ass'n v. Motorola, Inc., 105 F.3d 841 (2d Cir.1997).
 
 
 27
 Prior judicial rulings on similar questions are infrequent. All are consistent with our ruling on these facts. In Archipelago, the plaintiff, Nasdaq, had created the Nasdaq-100 index and an ETF, QQQ, which tracked that index. Defendants hosted and facilitated the trading of QQQ shares on the ArcaEx exchange, without a license from Nasdaq. Nasdaq made claims similar to those now advanced by plaintiffs—that by entertaining a market for the trading of QQQ shares, the defendant exchange was misappropriating Nasdaq's intellectual property in those shares. The district court dismissed the claim. The court ruled that, regardless of any intellectual-property interest Nasdaq held in the QQQ fund, no such interest was infringed when an exchange provided a marketplace for the trading of the shares Nasdaq had sold to the public. Id.
 
 
 28
 The opinion relied in part on a Ninth Circuit decision, Golden Nugget, Inc. v. American Stock Exchange, Inc., 828 F.2d 586 (9th Cir.1987). In that case, the Golden Nugget corporation brought suit against the American Stock Exchange, alleging that by issuing, listing, and trading options on Golden Nugget stock without Golden Nugget's consent, the exchange misappropriated Golden Nugget's property, engaged in unfair competition, and infringed on the Golden Nugget trademark. The court dismissed the complaint, ruling essentially that, having sold its stock to the public, Golden Nugget had relinquished "any propriety rights in the shares . . . that would allow it to control the manner or means of resale." Id. at 590; see also Champion Parts, Inc. v. Oppenheimer & Co., 878 F.2d 1003, 1008 (7th Cir.1989) (agreeing with the Golden Nugget analysis). The defendants accordingly were free to create options and facilitate trading in the options without offending any property interest of Golden Nugget.
 
 
 29
 The district court in Archipelago reasoned that, just as in Golden Nugget no property interest of the plaintiff in shares of its stock owned by its shareholders would permit it to control resale of those shares, Nasdaq did not possess a property interest in QQQ shares owned by investors that would permit it to control a secondary market. Archipelago, 336 F.Supp.2d at 303. We agree with the Archipelago court that once an index creator (or its licensee) has created a fund of securities tracking the index and has sold shares in the fund to the public, those who engage in secondary trading of the fund's shares, or provide a marketplace for such trading, do not infringe on a property interest of the creator of the index and the fund.[10]
 
 
 30
 The same reasoning applies to options on shares in the DIAMONDS and SPDR funds. As plaintiffs acknowledge in their complaints, the options in question confer on the holder the right, but not the obligation, to buy or sell shares in the ETFs for a specified price on or before a certain date. When ISE creates, lists, and facilitates the trading of these options, and OCC clears trades in these options, the defendants are simply enabling investors to trade in future rights to buy or sell shares of ETFs. See also Golden Nugget, 828 F.2d at 591. Our ruling that such action offends no exclusive intellectual-property right of the creators of the indexes and the ETFs is consistent with the judgments in Archipelago and Golden Nugget.[11]
 
 
 31
 Plaintiffs argue that Standard & Poor's Corp. v. Commodity Exchange, Inc., 538 F.Supp. 1063 (S.D.N.Y.1982) ("Comex I"), aff'd, Standard & Poor's Corp. v. Commodity Exchange, Inc., 683 F.2d 704 (2d Cir.1982) ("Comex II"), and Board of Trade v. Dow Jones & Co., Inc., 98 Ill.2d 109, 74 Ill.Dec. 582, 456 N.E.2d 84 (Ill. 1983) ("Board of Trade"), are to the contrary. We disagree because of substantial differences between the contract rights involved in those cases and options on ETF shares.
 
 
 32
 In Comex, defendant Comex, a commodities exchange, was poised to publish the value of the S & P 500 index, giving it the name "Comex 500 Stock Index," and to create, issue, and trade futures contracts based upon that index. These contracts called for settlement in cash, based on the difference between the contracted value and the closing value of the S & P 500. See Comex I, 538 F.Supp. at 1065. S & P brought suit to restrain Comex from trading a futures contract based on the use of S & P's name or the S & P 500 index.
 
 
 33
 The district court found that Comex "intended improperly . . . to misappropriate the property of the plaintiff and to trade directly on . . . the S & P 500 Stock Index," id. at 1065, and that "Comex is misappropriating the S & P 500 Index and the skills, expenditures, labor and reputation of S & P in generating and producing the S & P 500 Index, for Comex's own advantage and profit by creating a futures contract based on the S & P 500 Index," id. at 1071. The district court granted a preliminary injunction restraining Comex from marketing and trading the futures contracts based on the S & P 500. To maintain the status quo until trial, the Court of Appeals affirmed the preliminary injunction, but a majority of the court relied only on the public interest in avoiding harm that might befall investors if trading in the options were instituted and then abruptly cut off. Id. at 711-12. The Court of Appeals expressed no view on the merits of the question of infringement.[12]
 
 
 34
 The district court's grant of a preliminary injunction in Comex I is not a precedent that substantially favors plaintiffs because the facts of that case are significantly different than those before us. In Comex, the futures contracts created by the defendants did not give rights in any basket of securities. Their value depended on a number—the number generated by the plaintiff's formula (and copied by defendants). The purchasers of the defendant's contracts bought the right to receive a payment of a size dependent on the number produced by plaintiff's index as of a future date. The factor that most influenced the decisions in Archipelago and Golden Nugget (as well as in the district court below), the fact that the plaintiff had sold shares to the public and therefore could not control the secondary market for those shares, was not present in Comex.
 
 
 35
 We find the same flaw in plaintiffs' reliance on Board of Trade, in which the Supreme Court of Illinois held that the attempt by the Chicago Board of Trade to create a futures contract based on an index identical to the DJIA constituted misappropriation of Dow Jones's investment in its index. Board of Trade, 98 Ill.2d at 121-22, 74 Ill.Dec. 582, 456 N.E.2d 84. Like Comex, Board of Trade involved a defendant's attempt to create index futures that would allow investors to speculate directly on the value of an index copied from the DJIA. Even if this constitutes misappropriation—and we express no view on this matter—it would not affect the outcome in the case before us, in which plaintiffs have licensed the creation of ETFs and the sale of their shares to the public, and ISE is simply creating a mechanism for trading in those shares.
 
 
 36
 Plaintiffs argue that the district court erred in concluding that options are not a "new product . . . but merely an opportunity to buy or sell the ETF." We agree with plaintiffs that the options created by ISE are a new product. ETF options are securities distinct from ETFs. See Fry v. UAL Corp., 84 F.3d 936, 938 (7th Cir.1996) ("Puts and other stock options are securities within the meaning of the Securities Exchange Act. . . ."); 15 U.S.C. § 77b(a)(1) (defining "security," for purposes of the Securities Act of 1933, to include an option); 15 U.S.C. § 78c(a)(10) (defining "security," for purposes of the Securities Exchange Act of 1934, to include an option); SEC Release No. 34-40157, 63 Fed.Reg. 37428 n. 26 (July 10, 1998) (referring to ETF options as a "new securities product"). But this is irrelevant. It does not change the fact that an option, by its very definition, is the right to buy or sell an underlying security. What is critical is not that the options are new securities, but that they are a means for trading financial products the plaintiffs have licensed for sale to the public. Moreover, while we accept as true plaintiffs' assertion that ETF options are generally settled for cash, without transfer of the ETF shares, this does not change the legal right conveyed by the option contract-to buy or sell ETF shares.[13]
 
 B. Trademark Claims
 
 37
 Dow Jones alleges that "ISE's threatened use of the Dow Jones Marks to market or promote DIAMONDS®" constitutes trademark infringement and dilution under federal and state law. It also claims that "[b]y approving and clearing ISE's planned DIAMONDS® options, with knowledge that ISE lacked a license from Dow Jones, OCC will have contributed to the infringing use of the Dow Jones Marks." These allegations, without more, are insufficient to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). While "[a] complaint need only `give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests,'" Phillip v. Univ. of Rochester, 316 F.3d 291, 293 (2d Cir.2003) (quoting Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)), "[a] pleading . . . [must] contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R.Civ.P. 8(a). The mere assertion that ISE's intended use of the Dow Jones marks would constitute trademark infringement and dilution, without any factual allegations concerning the nature of the threatened use, does not give the defendants fair notice of the claims against them and does not show, by facts alleged, that Dow Jones is entitled to relief. As to the trademark claims, Dow Jones's complaint, "consists of conclusory allegations unsupported by factual assertions" and therefore it "fails even the liberal standard of Rule 12(b)(6)." De Jesus v. Sears, Roebuck & Co., Inc., 87 F.3d 65, 70 (2d Cir.1996) (quoting Palda v. Gen. Dynamics Corp., 47 F.3d 872, 875 (7th Cir.1995)); see also Smith v. Local 819 I.B.T. Pension Plan, 291 F.3d 236, 240 (2d Cir.2002) ("[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss.") (internal quotation marks omitted).
 
 
 38
 McGraw-Hill's complaint does not suffer from quite the same deficiency as Dow Jones's complaint. In addition to alleging that "ISE's threatened use of the S & P Marks to market or promote SPDR Options" will constitute trademark infringement and dilution, the McGraw-Hill complaint adds that in a January 5, 2005 press release, ISE used the phrase "options on SPDR®." Thus, McGraw-Hill appears to be arguing that ISE's use of the term "SPDR" when describing SPDR options constitutes a trademark violation.
 
 
 39
 We agree with the district court that such a claim fails as a matter of law. While a trademark conveys an exclusive right to the use of a mark in commerce in the area reserved, that right generally does not prevent one who trades a branded product from accurately describing it by its brand name, so long as the trader does not create confusion by implying an affiliation with the owner of the product. See Polymer Tech. Corp. v. Mimran, 975 F.2d 58, 61-62 (2d Cir.1992) ("As a general rule, trademark law does not reach the sale of genuine goods bearing a true mark even though the sale is not authorized by the mark owner."); Golden Nugget, 828 F.2d at 591 ("Describing [a] product nondeceptively and by name brand has never been a violation of a manufacturer's trademark."); Prestonettes, Inc. v. Coty, 264 U.S. 359, 368, 44 S.Ct. 350, 68 L.Ed. 731 (1924) ("When the mark is used in a way that does not deceive the public we see no such sanctity in the word as to prevent its being used to tell the truth. It is not taboo."). Thus, the allegation that ISE will use the word "SPDR" in describing the SPDR shares covered by its options does not save the McGraw-Hill complaint from Rule 12(b)(6) dismissal.[14]
 
 Conclusion
 
 40
 For the reasons stated above, we affirm the dismissal of the complaints and, as necessarily follows from the insufficiency of a complaint, the denial of a preliminary injunction.
 
 
 
 Notes:
 
 
 [1]
 The Honorable Mark R. Kravitz, United States District Judge for the District of Connecticut, sitting by designation
 
 
 [2]
 These two actions were consolidated in the district court, and the appeals were heard in tandem before this court
 
 
 [3]
 The actions of arbitrageurs, coupled with the ETF issuers' readiness at all times to issue new blocks of ETF shares in exchange for portfolios of the underlying securities comprising the tracked index, and vice versa, ensures that, despite growing or diminishing demand for the shares of the ETF, its market value will not deviate significantly from the market value of the securities constituting the fund. While the parties disagree as to how closely the ETFs track their respective indexes, we believe there is no dispute that the actions of arbitrageurs, seeking to profit from any separation that develops between the prices of the ETF shares and the underlying portfolios, will constantly push the two into virtual parity
 
 
 [4]
 The initial complaint contained claims against ISE and OCC. On March 7, McGraw-Hill voluntarily dismissed its action against OCC without prejudice
 
 
 [5]
 McGraw-Hill alleges trademark violations under § 32 and § 43 of the Lanham Act, as well as under New York common law and New York General Business Law § 360-l. The complaint also contains a claim for money had and received. We do not discuss the latter claim and deem it waived, as McGraw-Hill has raised no arguments relating to it on appeal.
 
 
 [6]
 An option on an index, in terms of the legal rights of the parties, functions differently from an option on the shares of an ETF. An option directly on the index does not contemplate the purchase or sale of an ownership interest in a pool of securities. It is simply a bet on the future value of the index. If at the expiration date the index is above the value stated in the option contract, the holder of a call option has the contractual right to receive the difference. If at the expiration date the index is below the value stated in the option contract, the holder of a put option has the contractual right to receive the difference
 
 
 [7]
 Dow Jones's complaint also contains claims of tortious interference with contract and unjust enrichment. Dow Jones addresses these claims only in a cursory footnote in its initial appellate brief. We therefore deem them waivedSee Tolbert v. Queens College, 242 F.3d 58, 75 (2d Cir.2001) ("A contention is not sufficiently presented for appeal if it is conclusorily asserted only in a footnote."); United States v. Restrepo, 986 F.2d 1462, 1463 (2d Cir.1993) ("We do not consider an argument mentioned only in a footnote to be adequately raised or preserved for appellate review."). Moreover, while Dow Jones points out that the district court failed to address these two claims, it presents no meaningful argument as to why they should not have been dismissed.
 
 
 [8]
 Plaintiffs argue that New York's law of unfair competition is a "`broad and flexible doctrine that depends more upon the facts set forth . . . than in most causes of action.'"Telecom Int'l, 280 F.3d at 197 (quoting Roy Export, 672 F.2d at 1105) (ellipsis in original). Whatever the breadth and flexibility of such a claim, it depends upon the allegation of facts that, if true, would constitute misuse of plaintiffs' property. We find no such allegation. (While defendants argue that Nat'l Basketball Ass'n v. Motorola, Inc., 105 F.3d 841 (2d Cir.1997), severely limits the scope of a misappropriation claim under New York law, Motorola did not purport to address the scope of a misappropriation claim where, as here, the information does not fall within the scope of federal copyright law.)
 
 
 [9]
 Our holding does not address the situation where a proprietary index is employed in the creation of a financial instrumentSee, Standard & Poor's Corp. v. Commodity Exch., Inc., 538 F.Supp. 1063 (S.D.N.Y.1982), aff'd, Standard & Poor's Corp. v. Commodity Exch., Inc., 683 F.2d 704 (2d Cir.1982); Bd. of Trade v. Dow Jones & Co., Inc., 98 Ill.2d 109, 74 Ill.Dec. 582, 456 N.E.2d 84 (Ill.1983).
 
 
 [10]
 In one respect, we take issue with various pertinent court opinions. Repeatedly, courts have introduced their discussions with the proposition that the crucial question in such cases is whether the plaintiff retains an intellectual-property interest in securities it has sold to the publicSee, e.g., Golden Nugget, 828 F.2d at 590 ("To succeed on any of its claims, Golden Nugget must persuade us that it has a property or other protectable interest in Golden Nugget common stock owned by its shareholders."); Archipelago, 336 F.Supp.2d at 303 ("The question that underlies each of the common law causes of action is whether Nasdaq has the type of interest in the QQQ product that is capable of being protected by a license."); McGraw-Hill, 2005 WL 2100518, at *1 ("This action poses the question—can there be a valid property right in trading options on index-tracking stocks without a license from the index providers?"). While it is surely true that a plaintiff cannot succeed on a claim of this nature without showing that it has an intellectual-property interest in the securities, it does not follow that the plaintiff will prevail if it makes that demonstration. Ultimately the question is not whether the plaintiff has intellectual-property rights in the securities designed according to the plaintiff's proprietary formulas, but rather whether the actions of the defendants relating to the markets for those securities infringe any property rights of the plaintiff. To illustrate by analogy to trademark rights, in all probability the plaintiff in Golden Nugget retained a trademark in the trade name "Golden Nugget." Nonetheless, so long as the defendant did not create confusion by improper use of the "Golden Nugget" name, the making of an option market for the shares (including describing those options by using the "Golden Nugget" name), did not infringe the plaintiff's rights. In this case we express no view as to what property right, if any, plaintiffs retain in the index values released to the public. Cf. Int'l News Serv. v. Associated Press, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918) (affirming the grant of a preliminary injunction barring International News Service from copying or paraphrasing articles published by the Associated Press in East Coast newspapers and publishing them in West Coast Newspapers). We hold only that the conduct alleged in the complaints does not constitute an infringement of any such property right.
 
 
 [11]
 Plaintiffs seek to distinguish this case fromArchipelago by reference to the Archipelago court's emphasis on the fact that the defendant exchange had not created a new security linked to the plaintiff's index, Archipelago, 336 F.Supp.2d at 303, which they argue has been done in this case. However, it is the securities created by plaintiffs (i.e., the ETF shares) that depend on the plaintiffs' indexes. By creating options for trading the securities created by plaintiffs, defendants have merely provided a method for buying and selling those securities.
 
 
 [12]
 Plaintiffs contend that the ruling of the Court of Appeals favors their position. However, the court's ruling, expressed in three separate opinions, reached no conclusion as to the merits. Judge Pierce concluded that "the balance of hardships tips decidedly towards S & P" by reason of a risk of irreparable harm to S & P, and that the preliminary injunction was further justified by consideration of the public interest, by reason of the harm that would likely befall investors if trading in the Comex 500 futures were initiated and then abruptly cut offComex II, 683 F.2d at 711-12. Judge Knapp, sitting by designation, wrote only that "I concur in the result for the reasons expressed by Judge Newman." Id. at 712. Judge Newman wrote:
 When Standard & Poor's enters the business of publishing an index of selected stock issues, there can be little doubt that another company endeavoring to publish the same index would face liability for misappropriation no matter how it merchandised its product and would face liability for trademark infringement if its merchandising created a risk of confusion between its product and that of Standard & Poor's. However, when Standard & Poor's makes its stock index known to the public, different, novel, and, in my judgment, close questions are presented when another company enters a business other than the publishing of stock indices—here the marketing of futures contracts—and in its business uses the Standard & Poor's index as a reference point — here, the settlement price for the contracts.
 Id. Beyond characterizing it as a "close" question, Judge Newman expressed no further view of the merits but concurred in the affirmance of the preliminary injunction to maintain the status quo pending resolution of the merits, solely by reason of the public interest concern identified by Judge Pierce.
 
 
 [13]
 Plaintiffs also argue that the district court erred when it concluded that ETF shares have value independent of the indexes on which they are based because of the securities held by the ETFSee McGraw-Hill, 2005 WL 2100518, at *4 ("ETFs have an additional basis for value in that they are worth the combined price of the stocks that comprise the fund, so, while they are still connected to the indexes they track, they do not rely solely on the index for their existence and value."). They claim that this was based on fact-finding inappropriate on a motion to dismiss and was contrary to the allegation in Dow Jones's complaint that "if Dow Jones stopped producing the DJIA and its related services, trading in both DIAMONDS and DIAMONDS options would cease entirely." There is no inconsistency between the district court's observation that ETFs have value independent of the indexes and Dow Jones's allegation that trading in the ETFs would cease if Dow Jones ceased to publish the DJIA. Neither complaint alleges that the ETF shares would have no further value if the plaintiffs ceased to produce their indexes. The district court's observation that the ETFs would have value notwithstanding the cessation of publication of the indexes flows inevitably from the fact, acknowledged in the complaints, that the ETFs own a portfolio of shares in leading United States companies. Furthermore, neither complaint alleges that upon cessation of the publication of the indexes the trustees of the ETFs would not liquidate the ETFs by distributing their securities to the shareholders or selling the securities and giving the proceeds from the sale to the shareholders. The cessation of trading in ETF shares, for whatever reason, might impair their value but would not nullify it.
 While Dow Jones has offered no explanation why the ETF shares, which represent ownership interests in a portfolio of valuable securities, would cease to be traded, we recognize the obligation to accept allegations of a complaint in reviewing a motion to dismiss under Rule 12(b)(6). See Shah v. Meeker, 435 F.3d 244, 248 (2d Cir.2006). Acceptance of this improbable allegation, however, does not affect our judgment. It remains uncontested that plaintiffs authorized the sale of the ETF shares to the public, and in so doing, authorized a market for secondary trading of those shares, which includes options for the purchase and sale of the shares.
 
 
 [14]
 It is of course possible that the defendants might market options on DIAMONDS and SPDR shares in a manner that would create confusion as to an affiliation with the plaintiffs and result in trademark infringement or dilution. For example, inArchipelago the court denied the motion to dismiss Nasdaq's trademark claims where Nasdaq alleged that the language of three particular advertisements regarding QQQ trading on the ArcaEX exchange would confuse the public into thinking that defendants's actions were sponsored by Nasdaq. Archipelago, 336 F.Supp.2d at 299, 305. But the complaints in this case allege nothing of the kind.